UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

APR 19 2013

RECEIVED

USCA Case #13-1140    Document #1431741    Filed: 04/19/2013

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED APR 19 2013

CLERK

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AIRLINES FOR AMERICA, ) | |
| ) | |
| REGIONAL AIRLINE ASSOCIATION, ) | |
| ) | |
| AND ) | |
| ) | |
| AIR LINE PILOTS ASSOCIATION, ) | |
| INTERNATIONAL, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | CASE NO. _____ |
| ) | 13-1140 |
| FEDERAL AVIATION ) | |
| ADMINISTRATION, ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| TRANSPORTATION, ) | |
| ) | |
| MICHAEL P. HUERTA, in his official ) | |
| capacity as Administrator of the Federal ) | |
| Aviation Administration, ) | |
| ) | |
| AND ) | |
| ) | |
| RAY LAHOOD, in his official capacity ) | |
| as Secretary of the U.S. Department of ) | |
| Transportation, ) | |
| ) | |
| Respondents. ) | |

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. § 46110, 5 U.S.C. §§ 702-706, and Rule 15(a) of the Federal Rules of Appellate Procedure, Airlines for America, the Regional Airline Association, and Air Line Pilots Association, International—trade associations and a union whose members include airlines, air cargo carriers, and pilots—hereby petition this Court for review of the Federal Aviation Administration ("FAA") and Department of Transportation ("DOT")'s capacity reduction plan implementing furloughs of air traffic controllers and other measures uniformly across air traffic facilities, as a result of an erroneous interpretation of the requirements of the Budget Control Act of 2011, Public Law No. 112-25, 125 Stat. 240.  The capacity reduction plan requires a blanket 10% cut in hours across the board, with no consideration of the impacts on the travelling public or the air transportation system.  Rather, the plan has the effect of creating the maximum disruption for travelers because its effects will, by the FAA's own admission, be felt the greatest at some of the largest, most frequently travelled airports.  This plan, in essence, will unnecessarily cause one out of three passengers to be delayed every day, and make every day in the air traffic management system twice as delayed as the single *worst* day last year, in terms of flight delays.  Should these delays occur as FAA has said, it will have a direct ripple effect on passengers and shippers.  Simply stated, passengers will opt not to fly to avoid inconvenience, less cargo will ship and jobs will be lost, all as a result of a needless furlough plan.

In its briefing, FAA stated that it would implement automatic ground delay programs on April 21, 2013. It further stated that it would implement ground delays regardless of conditions on the ground. At the time of the filing, FAA has still not details to Petitioners and the public, and has instead orally presented key elements to public stakeholders, including Petitioners, for the first time *a mere five days before it is scheduled to take effect*, and have denied requests to provide full details of the plan in writing. Petitioners and their members have not received any meaningful information from the FAA on how the furloughs required under the capacity reduction plan will impact air traffic schedules, and the FAA has apparently done no such analysis. Nonetheless, the Plan is, to some extent, reflected in (a) a presentation by FAA on April 16, 2013 and accompanying briefing paper, (b) the Testimony on April 16, 2013, of Administrator Huerta before the United States Senate Committee on Commerce, Science and Transportation, and (c) the furlough decision letters reportedly issued on April 10, 2013. The April 16, 2013 briefing paper and two versions of the written Testimony are submitted as Attachments A, B, and C respectively, to this Petition.[1]

---

[1]     One version of the April 16, 2013 testimony is posted on the FAA's website. *See* http://www.faa.gov/news/testimony/news_story.cfm?newsId=14514. A second version of the April 16, 2013 testimony is posted on the website for the Senate Committee on Commerce, Science, and Transportation. *See* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=4171322f-8181-4ccb-94fc-e5b5b1f010ce.

A transcript of the entire April 16, 2013 Committee hearing, including Administrator Huerta's remarks, is submitted as Attachment D.

What FAA has publicly represented about its capacity reduction plan demonstrates that, rather than faithfully apply its statutory mandate while complying with the Budget Control Act, Respondents have adopted a course of action that will harm airline passengers and shippers, the air transportation industry, the traveling public, and interstate and international commerce based on a false legal premise—that Congress has required the precise cuts that Respondents have ordered. However, the Budget Control Act does nothing of the sort. Because the FAA erred in assuming that the Budget Control Act *mandates* the capacity reduction plan, the FAA's decision must be vacated and remanded so that the agency may properly comply with the statute and adopt a program that is lawful and avoids severe disruptions of the air transportation system.

The FAA's statutory mandate includes fundamental responsibilities to preserve "the public right of freedom of transit through the navigable airspace" and to "develop plans and policy for the use of the navigable airspace . . . to ensure the safety of aircraft and the efficient use of airspace." *See* 49 U.S.C. §§ 40101(c)(2), 40103(c) ("Federal Aviation Act"). Air traffic control—a government monopoly in the United States—is a vital element of the air traffic system that directly

4

controls and regulates the ability of the nation's airlines to operate, affecting the number and timing of flights, flight performance, and flight costs.

Following the sequestration directed by the President on March 1, 2013 pursuant to the Budget Control Act of 2011, with a 5% spending reduction in certain non-exempt budget accounts, the FAA and DOT have now chosen to implement ground delay programs, apparently including furloughs of air traffic controllers, *uniformly* across air traffic facilities, starting on Sunday, April 21, 2013. By contrast, a well-planned, carefully-analyzed, non-uniform approach to air traffic management that still meets the required spending reductions would minimize system-wide delays and "ensure the safety of aircraft and the efficient use of airspace" because staffing reductions harm capacity at some airports more than at other airports. *See* 49 U.S.C. §§ 40101(c)(2), 40103(c).

The capacity reduction plan does none of these things. Indeed, an indiscriminate, across-the-board 10% furlough does not necessarily drop an airport's air traffic capacity by 10%. For example, the FAA has indicated that a 10% reduction in staffing results in reduced arrivals per hour of 21% at Newark, 36% at Chicago O'Hare, and 40% at Los Angeles. Moreover, staffing reductions at the largest, busiest airports are particularly damaging because they have system-wide ripple effects. Although the FAA has the ability and responsibility to

implement spending reductions in a manner that minimizes harm to the public and the air transportation system, the FAA has failed to do so.

As noted above, Respondents' only proffered rationale for furloughing air traffic controllers uniformly across facilities—without consideration for how cuts could be better designed to protect freedom of transit, airspace efficiency, and safety of the air traffic system, and without any economic analysis comparing different approaches to cuts—is that the Budget Control Act sequestration leaves no discretion whatsoever for strategic cuts that minimize harm to the national air transportation system.    The FAA Administrator has said sequestration must be applied "by program, project, and activity within the various accounts within the FAA's budget" and must be applied *uniformly* to all facilities.    However,  that premise—that the sequester requires furloughing air traffic controllers at all facilities in a mindless, across-the-board manner, without consideration of the consequences and without room for minimizing impacts by making choices within certain large dollar budget accounts—is incorrect under sections 101-104 of the Budget Control Act and 2 U.S.C. §§ 900-922.    It is also inconsistent with the FAA's statutory obligation to operate the air traffic control system in a responsible and efficient manner, *see* 49 U.S.C. §§ 40101(c)(2), 40103(c).    The capacity reduction plan ordered by the FAA and DOT flows from an erroneous statutory interpretation, and, as such, cannot be sustained.

6

The unnecessary air traffic impacts expected to result from the FAA and DOT capacity reduction plan are significant. The FAA has suggested that the scheme will potentially delay approximately 6,700 flights *every day*, which is more than twice the greatest number of delays experienced on the worst systemwide delay day in 2012. (The FAA reported that during 2012 the highest volume of delays on any single day was 2,994 flights, largely related to serious weather impact.) In particular, the FAA has said the capacity reduction plan will produce substantial increased delays at eight major airports: Chicago O'Hare (ORD), Fort Lauderdale/Hollywood (FLL), John F. Kennedy (JFK), LaGuardia (LGA), Los Angeles (LAX), Minneapolis-St. Paul (MSP),[2] Newark Liberty (EWR), and San Diego (SAN). This includes some of the busiest airports in the United States, impacting the largest number of travelers, with necessary ripple effects on travel that will certainly be system wide at other airports as well. The FAA anticipates that six other major airports may also be expected to experience increased delays.[3] The FAA has further represented that the scale of delays under the plan will force an extension of airline schedules into the late evening or early morning hours unless carriers cancel scheduled flights.

---

[2] Subsequently FAA orally indicated that Minneapolis-St. Paul may not remain on that list.

[3] Philadelphia (PHL), Charlotte/Douglas (CLT), Hartsfield-Jackson Atlanta (ATL), Miami (MIA), Chicago Midway (MDW), and San Francisco (SFO).

Against this backdrop, it is notable that the FAA has previously handled similar sequestration cuts without resorting to extreme controller furloughs like the ones it has now ordered to achieve a 5% spending reduction. In 1986, Congress imposed a sequestration under the statute popularly known as the Gramm-Rudman-Hollings Act, 2 U.S.C. § 900 *et seq*. That sequestration required a budget cut of 4.3%, which was accomplished without freezing hires of air traffic controllers, much less furloughs.[4]

The FAA and DOT have provided little insight into why the FAA's resources, even after making cuts required by sequestration, cannot still adequately support air traffic control operations at major airports. DOT's budget in FY 2012 was approximately $70.1 billion, of which the FAA accounted for $15.9 billion of budget authority. Within the FAA's own FY 2012 budget, the Operations account, which includes air traffic control, had approximately $9.653 billion of budget authority in FY 2012. At the time of the President's sequestration order, the Office of Management and Budget reported that the Budget Control Act required FAA spending reductions of $637 million, with the FAA saying $360 million of that must come from within the Operations account. But as recently as FY 2007, when air traffic levels were *higher* than today and the controller workforce was *smaller*, the FAA operated with a *lower* budget of $14.696 billion, including $8.374 billion

---

[4] *See FAA Plans for Reduced Fiscal 1986 Budget*, Aviation Week & Space Technology at 16 (Jan. 13, 1986), Attachment E.

of budget authority for Operations. In other words, the FAA in FY 2007 managed its entire Operations account—without furloughs, with fewer controllers, and with greater air traffic volume—despite having a smaller budget than what it will have in FY 2013 even after making sequester-related cuts.

Despite repeated attempts by Congress to obtain information about the FAA's plans to implement cuts, there has been no response from the FAA. Moreover, although the Budget Control Act became law in August 2011, the FAA apparently did not plan how to manage spending levels until nearly two years later, after President Obama implemented the sequester by order on March 1, 2013. Six weeks later, the FAA has still failed to provide transparency into the details of its capacity reduction plan; while it has revealed that the FAA will direct reduced operations at key major airports, airlines have been given little notice and no information concrete enough to start developing responses, such as changing flight and staffing schedules—changes which take months, not days or even weeks, as airlines set schedules and sell tickets six months in advance or more. Nor have Petitioners or their members been provided underlying data or the methodology employed by the FAA to predict the negative consequences of furloughs at the many affected airports despite requests from Petitioners. According to FAA personnel in briefings, the agency as of April 16, 2013, has not yet even coordinated its plans with other government agencies with responsibilities for

9

airports, including the Transportation Security Administration and U.S. Customs and Border Protection.

The capacity reduction plan is not consistent with what DOT and FAA officials had previously stated was their goal: to implement sequestration in a manner that would have as little impact as possible on the fewest number of travelers. To the contrary, because it is premised on an incorrect reading of the Budget Control Act, the capacity reduction plan will impose unnecessary, widespread delays that harm airlines, passengers, shippers, businesses, and the national economy—to which the aviation industry contributes $1.3 trillion. In fact, the FAA's own analysis demonstrates that its approach will cause the greatest harm at the largest airports impacting the most travelers, with ripple effects throughout the entire air transportation system. If the FAA's forecast delays are accurate, one out of three passengers will be delayed every day. Further, by the FAA's own projections, delays annually cost airlines and their customers in actual costs and lost productivity $31 billion annually—before any FAA-imposed sequester delays, which would presumably double that number. Respondents have denied Petitioners' request to avoid or delay implementation of the scheduled furloughs under the capacity reduction plan, and have stated that they will institute this plan starting on April 21, 2013—a mere five days after revealing the plan to

Petitioners.    Given the impacts the FAA says it anticipates, Petitioners are compelled to seek emergency relief from this Court pending further review.

In sum, by misreading the Budget Control Act to eliminate all discretion, the FAA and DOT's capacity reduction plan exacerbates sequester-related disruption rather than minimizing it.  But the law does not require these extreme actions, and Respondents cannot use the Budget Control Act to shield themselves from accountability.  When injurious agency action is premised on complying with a law that does not in fact require such improvident action, it cannot be sustained. Accordingly, these Petitioners—trade organizations whose members and affiliates transport more than 90% of U.S. airline passenger and cargo traffic, and the largest airline pilots union with more than 50,000 pilot members—bring this Petition for Review to challenge the capacity reduction plan as premised on an erroneous interpretation of law and subject to review by this Court under the Transportation Act and the Administrative Procedure Act.

This Petition requests that the Court instruct the FAA and DOT that their legal interpretation is inconsistent with the Budget Control Act and that the capacity reduction plan is not required by law.  The Court, thus, should vacate the capacity reduction plan and remand to the agencies with instructions to instead reasonably and responsibly exercise their statutory discretion, consistent with the public interest, in accordance with the law.

Dated: April 19, 2013                  Respectfully submitted,


  /s with permission                   Jeffrey A. Rosen, P.C.
David A. Berg                          John C. O'Quinn
AIRLINES FOR AMERICA                   Arjun Garg
1301 Pennsylvania Avenue, N.W.         John S. Moran*
Suite 1100                             KIRKLAND & ELLIS LLP
Washington, D.C. 20004                 655 Fifteenth Street, N.W.
Tel: 202-626-4000                      Suite 1200
dberg@airlines.org                     Washington, D.C. 20005
                                       Tel: 202-879-5000
Counsel for Petitioner                 Fax: 202-879-5200
*Airlines for America*                 jeffrey.rosen@kirkland.com
                                       john.oquinn@kirkland.com
                                       arjun.garg@kirkland.com
  /s with permission                   john.moran@kirkland.com
Jonathan A. Cohen
R. Russell Bailey                      Counsel for Petitioner
AIR LINE PILOTS ASSOCIATION,           *Airlines for America*
INTERNATIONAL
1625 Massachusetts Avenue NW, 8th      * *Admitted only in Virginia. Practice is*
Floor                                  *supervised by principals of the firm.*
Washington, DC 20036
Tel: 202-797-4086                        /s with permission
Jonathan.Cohen@alpa.org                Lorraine B. Halloway
Russell.Bailey@alpa.org                Gerald F. Murphy
                                       CROWELL & MORING LLP
                                       1001 Pennsylvania Ave NW
Counsel for Petitioner                 Washington, DC 20004
*Air Line Pilots Association,*         Tel: 202-624-5000
*International*                         Fax: 202-628-5116
                                       lhalloway@crowell.com
                                       gmurphy@crowell.com

                                       Counsel for Petitioners
                                       *Regional Airline Association*

12

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Air Transport Association of America, Inc., d.b.a. Airlines for America ("A4A"), Regional Airline Association ("RAA"), and the Air Line Pilots Association, International ("ALPA") submit the following as their Corporate Disclosure Statements.

A4A's members are Alaska Airlines, Inc.; American Airlines, Inc.; Atlas Air, Inc.; Delta Air Lines, Inc.; Federal Express Corporation; Hawaiian Airlines, Inc.; JetBlue Airways Corp.; Southwest Airlines Co.; United Continental Holdings, Inc.; United Parcel Service Co.; and US Airways, Inc.   A4A is a District of Columbia corporation with its principal place of business in the District of Columbia.  A4A has no parent corporation, does not issue stock, and no publicly held company controls more than 10% of A4A.  The fundamental purpose of A4A is to foster a business and regulatory environment that ensures safe and secure air transportation and enables U.S. airlines to flourish, stimulating economic growth locally, nationally and internationally.

RAA's members include 28 different regional commercial passenger airlines from across the United States: Aerolitoral, Air Wisconsin Airlines Corp, AirNet Systems Inc., American Eagle Airlines, Cape Air, Chautauqua Airlines, CommutAir, Compass Airlines, Empire Airlines, Era Aviation, ExpressJet, GoJet,

Grand Canyon Airlines/Scenic, Great Lakes Aviation, Horizon Air, Island Air, Jazz Air, Mesa Air Group, New England Airlines, Piedmont Airlines, Pinnacle Airlines, Inc., PSA Airlines, Republic Airlines, Seaborne Airlines, Shuttle America, Silver Airways, SkyWest Airlines, Inc, and Trans States Airlines. RAA is a District of Columbia corporation with its principal place of business in the District of Columbia. RAA has no parent corporation, does not issue stock, and no publicly held company controls more than 10% of RAA.

ALPA is an unincorporated, non-profit labor union, representing commercial airline pilots. ALPA has no parent corporation, and no publicly held company has more than 10 percent or greater ownership interest in ALPA.

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2013, I caused a true and correct copy of the foregoing Petition for Review to be served by Federal Express on the following persons:

Michael P. Huerta
Administrator
Federal Aviation Administration
800 Independence Avenue, S.W.
Washington, DC 20591

Ray LaHood
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, DC 20590

Attorney General Eric Holder
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dated: April 19, 2013

___/s John C. O'Quinn_____

John C. O'Quinn
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200
john.oquinn@kirkland.com

*Counsel for Airlines for America*

# Sequester Impacts to Major Airports

## Federal Aviation Administration
## Air Traffic Organization



Delay programs are modeled with flight data from Friday March 29, 2013, a blue-sky day in the national airspace system

— Actual system delays for March 29, 2013 were 177

— SDF is an exception and is modeled on data from April 3, 2013 to capture overnight cargo operations

Eight core airports will require daily ground delay programs, delaying approximately 3,800 flights daily

An additional six core airports will require daily traffic management initiatives resulting in approximately 2,900 additional flights being delayed

The potential daily delay account then becomes approximately 6,700 flights, assuming good weather and no additional staffing impacts

By comparison, the highest-delayed day of calendar year 2012, July 26, delayed 2,994 flights

With this number of delayed flights, airline schedules will extend into the late evening or early morning hours unless the carriers cancel flights

# Eight airports will realize increased delay:

**EWR**  Newark Liberty International Airport

**JFK**  John F. Kennedy International Airport

**LGA**  La Guardia Airport

**FLL**  Fort Lauderdale/Hollywood International Airport

**ORD**  Chicago O'Hare International Airport

**MSP**  Minneapolis-St Paul International/World-Chamberlain Airport

**SAN**  San Diego International Airport

**LAX**  Los Angeles International Airport





# Six airports may realize increased delay:

**PHL**  Philadelphia International Airport

**CLT**  Charlotte/Douglas International Airport

**ATL**  Hartsfield - Jackson Atlanta International Airport

**MIA**  Miami International Airport

**MDW**  Chicago Midway International Airport

**SFO**  San Francisco International Airport





# 13 airports not likely to realize increased delay:

| | |
|---|---|
| **BOS** | General Edward Lawrence Logan International Airport |
| **TEB** | Teterboro Airport |
| **BWI** | Baltimore/Washington International Thurgood Marshall Airport |
| **MCO** | Orlando International Airport |
| **SDF** | Louisville International Airport-Standiford Field |
| **DFW** | Dallas/Fort Worth International Airport |
| **DAL** | Dallas Love Field Airport |
| **IAH** | George Bush Intercontinental/Houston Airport |
| **HOU** | William P Hobby Airport |
| **DEN** | Denver International Airport |
| **SLC** | Salt Lake City International Airport |
| **PHX** | Phoenix Sky Harbor International Airport |
| **LAS** | Mc Carran International Airport |







Appendices

**ATL**   Hartsfield - Jackson Atlanta International   **LGA**   La Guardia Airport
Airport

**BOS**   General Edward Lawrence Logan   **MCO**   Orlando International Airport
International Airport

**BWI**   Baltimore/Washington International   **MDW**   Chicago Midway International Airport
Thurgood Marshall Airport

**CLT**   Charlotte/Douglas International Airport   **MIA**   Miami International Airport

**DAL**   Dallas Love Field Airport   **MSP**   Minneapolis-St Paul International/World-Chamberlain Airport

**DEN**   Denver International Airport   **ORD**   Chicago O'Hare International Airport

**DFW**   Dallas/Fort Worth International Airport   **PHL**   Philadelphia International Airport

**EWR**   Newark Liberty International Airport   **PHX**   Phoenix Sky Harbor International Airport

**FLL**   Fort Lauderdale/Hollywood International   **SAN**   San Diego International Airport
Airport

**HOU**   William P Hobby Airport   **SDF**   Louisville International Airport-Standiford Field

**IAH**   George Bush Intercontinental/Houston   **SFO**   San Francisco International Airport
Airport

**JFK**   John F. Kennedy International Airport   **SLC**   Salt Lake City International Airport

**LAS**   Mc Carran International Airport   **TEB**   Teterboro Airport

**LAX**   Los Angeles International Airport

# Coordinated Universal Time (UTC) Conversion

| | |
|---|---|
| Eastern Daylight Time | UTC - 4 hours |
| Central Daylight Time | UTC - 5 hours |
| Mountain Daylight Time | UTC - 6 hours |
| Pacific Daylight Time | UTC - 7 hours |

# Testimony – Statement of Michael Huerta

April 16, 2013

## Statement of Michael Huerta, Administrator

Before the Senate Committee on Commerce, Science and Transportation on FAA's Progress on Key Safety Initiatives

Good afternoon, Chairman Rockefeller, Ranking Member Thune and members of the committee. Thank you for the opportunity to be here today to discuss the FAA's progress on key safety initiatives.

As you are aware, this is my first appearance before you as Administrator of the FAA. I appreciate the work of this committee and of the full Senate in moving my confirmation forward. We have a great number of challenges and opportunities ahead, and I look forward to enhancing our productive working relationship.

The FAA's number one priority is safety. It's our mission, and we focus on it 24 hours a day.

First let me briefly address the Boeing 787. The company has redesigned the internal battery components and conducted extensive testing. This includes limited test flights–without passengers–using the redesigned battery prototype. The FAA is reviewing these test reports and analysis to make sure that the 787's new battery system ensures the safety of the aircraft and its passengers.

Turning to broader safety considerations, while aviation safety encompasses many technical issues, we cannot overlook the role of human beings in aviation and how they interact with sophisticated technology.

In the last few years, Congress has given us much guidance on how to advance aviation safety. And we have accomplished a great deal. The FAA overhauled flight and duty rules to guarantee that airline pilots have the opportunity to get the rest they need to operate safely. And we are increasing the required hours of experience a pilot must have before operating the controls of any airline flight. We are also finalizing a rule that requires more realistic training so that flight crews can better handle rare but serious scenarios.

The best way to enhance safety across the board is to improve the safety culture of an organization. Part of this effort involves self-reporting by our own employees on safety issues.

We have put programs in place for air traffic controllers and aviation technicians to report a problem, or even a mistake they may have made – and not fear retribution. This makes the system even safer.

We are taking many other actions to enhance safety across the board – including promoting safety management systems and sharing more data between industry and the FAA. By analyzing this data, we are able to identify trends and hazards across the airspace system and mitigate issues before something happens.

As you know, we are in a very uncertain and unpredictable fiscal environment.

The sequester is requiring the FAA to make significant cuts in services and investments. These cuts will impact air traffic control, NextGen implementation, and our certification services.

We are exercising all options to reduce costs – a hiring freeze; cutting contracts; cutting travel and other items not related to day-to-day operations.

One of our largest contracts is the Federal Contract Tower Program. We have notified 149 airports across the country that federal funding for their air traffic control towers will end in mid-June. These airports have lower activity levels, and together, these contract towers handle less than 3 percent of the commercial operations nationally and less than 1 percent of the passengers. Communities still have the option to keep their tower open if they are able to provide the funding, and the FAA stands ready to help with that transition.

I want to emphasize that as we undergo the difficult process of implementing the deep cuts required by the sequester, we refuse to sacrifice safety–even if this means less efficient operations.

In addition to contract towers, large facilities will also be affected. To reach the figure we need to cut from our payroll—which is our largest operating cost—we have to furlough 47,000 of our employees for up to 11 days between now and September.

The furloughs will reduce controller work hours at all airports with towers, but also at radar facilities across the country. Again, safety is our number one concern. We will only allow the amount of air traffic that we can handle safely to take off and land. This means travelers should expect delays. Today we are meeting with air carriers to go over specific operational impacts related to the furloughs facility by facility.

Furthermore, our aviation safety inspectors will have to focus their attention on the most pressing priorities and will devote their time to overseeing current activities to ensure continued operational safety of the existing fleet. These activities will take precedence over new projects.

Our overarching principle in making these difficult decisions is to maintain safety and offer the best air traffic services to the largest number of people both now and in the future.

It is my hope, and the hope of everyone at the Department of Transportation that our leaders can work together to rally around our nation's air transportation system and protect the great contribution that civil aviation makes to our economy.

Mr. Chairman, this concludes my prepared remarks. I would be pleased to answer any questions you may have.

### ###

This page can be viewed online at: http://www.faa.gov/news/testimony/news_story.cfm?newsId=14514

4STATEMENT OF MICHAEL P. HUERTA, ADMINISTRATOR, FEDERAL
AVIATION ADMINISTRATION, BEFORE THE COMMIITTEE ON COMMERCE,
SCIENCE AND TRANSPORTATION, COMMITTEE ON AVIATION ON FAA'S
PROGRESS ON KEY SAFETY INITIATIVES, APRIL 16, 2013.

Chairman Rockefeller, Senator Thune, members of the Committee:

Thank you for the opportunity to speak to you today. This is the first time I am testifying

before you as the confirmed Administrator of the Federal Aviation Administration

(FAA). I appreciate your support for my candidacy. It is a privilege to hold this position

and I welcome the challenges that will come with it. I hope to enjoy a long and effective

relationship with you and this Committee.

There are a number of important ongoing aviation safety-related initiatives that I know

are of interest to this Committee. We are working hard to meet the future demands of

aviation. From transitioning to the Next Generation of Air Transportation System

(NextGen) to integrating Unmanned Aircraft Systems (UAS) into the national airspace

system (NAS), the goals we are striving to meet are challenging, especially in light of the

existing fiscal constraints. But our workforce is dedicated and very aware that achieving

these goals are vital to FAA's ability to continue leading the world in aviation safety and

innovation.

Just over a year ago, Congress passed and the President signed the Federal Aviation

Reauthorization Modernization and Reform Act of 2012 (Reauthorization). As the

returning members of this Committee may recall, passage of the bill followed a long

odyssey that involved 23 extensions before a comprehensive bill was passed. During that

1

period, I spoke with Members individually about the impact the short-term extensions were having on our programs.  The Airport Improvement Program (AIP) was adversely impacted without the stability of a long-term authorization.  Airports across the country delayed the start of important capital projects due to the concern that funding was being authorized in very small amounts because of the short length of the extensions. As a consequence, during extension periods, airports were uncertain about committing to projects of all sizes, ranging from safety improvements to crucial infrastructure preservation to environmental impact mitigation, including sound insulation projects. Another impact to airport projects, as a result of multiple extensions was the inability of engineers, construction contractors, and material and equipment suppliers to place orders and conduct work.  Reduced amounts of funding were made available in accordance with the short-term extensions, so committing to long-term investments was problematic.  We very much appreciated the passage of a comprehensive authorization that promised important stability and predictability.

**Sequestration**

Now, just over one year later, the benefits of reauthorization are in jeopardy due to the budget reductions imposed by sequestration.  It is essential to the effective management of FAA's programs to have stability and predictability that can be relied upon. Sequestration places us in the position of even greater uncertainty than the days of multiple extensions.  Our agency has been working hard to plan for and implement the required cuts in a way that does not materially jeopardize our ability to ensure the highest levels of safety. Seventy percent of FAA's Operations budget is dedicated to employee

salaries and benefits, so they will bear a significant portion of the cuts. I can assure you that safety is the FAA's top priority. If sequestration means fewer flights can be safely accommodated in the NAS, then there will be fewer flights.

On April 10, I issued final furlough decision letters to over 47,000 employees. The furloughs generally will be on discontinuous days, approximately one day per bi-weekly pay period, for a maximum of 11 days between April 21 and September 30. We are also planning to eliminate midnight shifts in over 60 towers across the country starting this summer; cease federal funding at 149 air traffic control towers at airports with fewer than 150,000 flight operations or 10,000 commercial operations per year starting June 15, and reduce preventative maintenance and equipment provisioning and support for all NAS equipment. All of these changes will be finalized as to scope and details through collaborative discussions with our users and our unions.

As a result of employee furloughs and prolonged equipment outages resulting from lower parts inventories and fewer technicians, travelers should expect significant delays. We are aware that these service reductions will adversely affect commercial, corporate, and general aviation operators and the travelling public.

Beyond the impacts to air traffic, aviation safety employees will also experience furloughs that will impact airlines, aviation manufacturers, and individual pilots who need FAA safety approvals and certifications. While the agency will continue to address

3

identified safety risks, slowed aircraft certification and operations approval processes due to furloughs could negatively affect all segments of the aviation industry.

It is unfortunate that many of the positive benefits of the long-term reauthorization are being undermined by sequestration.

### FY 2014 Budget

The President released his FY 2014 Budget last week. The FAA's FY 2014 Budget request of $15.6 billion strikes a balance between maintaining current infrastructure while deploying key NextGen benefits to our stakeholders, upholding our critical safety programs, and modernizing our aviation infrastructure. Our request is $351 million lower than FY 2012. This 2.2 percent decrease supports the President's effort to reduce the deficit. Approximately half of our funding request is devoted to maintaining and improving the agency's safety programs. This includes the ability to perform safety inspections and carry out rulemaking and certification activities to move NextGen and commercial space initiatives forward.

The budget requests $9.7 billion to provide the operation, maintenance, and support of our air traffic control and air navigation systems, ensure the safe operation of the airlines and certify new aviation products, ensure the safety of the commercial space transportation industry, and provide overall policy oversight and management. This represents an increase of just 0.6 percent from the FY 2012 enacted level. This includes $1.2 billion to continue to promote aviation safety by regulating and overseeing the civil

4

aviation industry and continued airworthiness of aircraft, as well as certification of pilots, mechanics, and others in safety management positions. The $2.8 billion Facilities & Equipment (F&E) request enables FAA to meet the challenge of both maintaining the capacity and safety of the current national airspace while keeping a comprehensive asset modernization and transformation effort on track. The $166 million requested for Research, Engineering, and Development (RE&D) supports the continuation of work in both NextGen and other research areas such as environmental research, safety research in areas such as fire research, propulsion and fuel systems, unmanned aircraft, advanced materials research, and weather research. And the $2.9 billion request for Grants-in-Aid for Airports focuses Federal grant funding on smaller commercial and general aviation airports that do not have access to additional revenue or other outside sources of capital. This is coupled with a proposed increase to Passenger Facility Charges, from the current maximum of $4.50 to $8.00, thereby giving commercial service airports greater flexibility to generate their own revenue. Finally, in the Operations, F&E and RE&D requested amounts, we have included $1.002 billion for the NextGen portfolio, an increase of $67.2 million, or approximately 7 percent, above the FY 2012 enacted level. This level of program funding enables the FAA to continue to support near-term NextGen commitments in a budget-constrained environment.

**Boeing 787**

Turning to another matter that has received a great deal of attention, I would like to update you on the status of the review of Boeing 787's lithium batteries. On March 12, FAA approved Boeing's certification plan for the 787 battery system redesign. This was

5

done after a thorough review of the proposed modifications, as well as the company's plan to demonstrate that the modified system will meet FAA requirements.  Approval of the certification plan was the first step in the process to evaluate the 787's readiness for return to flight. It required Boeing to conduct extensive testing and analysis to demonstrate compliance with the applicable safety regulations.

The battery system improvements include a redesign of the internal battery components to minimize risk of a short circuit within the battery, better insulation of the cells, and the addition of a new containment and venting system.  These added protections are expected to help prevent and contain smoke and fumes in the event that a battery does malfunction.

Boeing flew limited non-passenger test flights of two aircraft that had the prototype versions of the new battery containment system installed.  The purpose of the test flights included validation of the aircraft instrumentation for the battery and testing of the battery enclosure, in addition to product improvements for other systems.  Boeing completed all required tests and analysis to demonstrate that the new design complies with FAA requirements.  The FAA is reviewing the test reports and analysis and will approve the redesign once we are satisfied Boeing has shown the redesigned battery system meets FAA requirements.

Aviation, from its very beginning, has stretched technological boundaries.  Technological change in aviation comes in waves.  For more than five decades, the FAA has compiled a

6

proven track record of safely introducing new technology and new aircraft. As we continue to do this, I want to make one thing crystal clear. The FAA takes very seriously its responsibility to establish aircraft safety standards and certify new products and technologies.

As you know, we are moving forward with a review of the critical systems of the Boeing 787. When we have a concern, we will analyze it until we are satisfied. I am confident that the FAA has the expertise needed to oversee the Dreamliner's cutting edge technology. We have the ability to establish rigorous safety standards and to make sure that aircraft meet them. The best way to do this is to bring together the best minds and technical experts in aviation to work on understanding how these new systems work and how to establish and meet appropriate safety standards.

We enhance safety by keeping the lines of communication open between industry and government – by fostering the ability and willingness to share information about any challenges we might be facing. We want to create an atmosphere where people feel they can share what they know, all in the pursuit of safety.

We all want the same outcome. We want to harness advances in technology to produce safe aircraft. We will never lose sight of our respective roles, but that does not mean that there is not a seat at the table for bright minds from industry to help inform the best way to navigate the complex technological issues we encounter. It would be short-sighted to overlook anyone's valuable expertise.

**Reauthorization**

As noted above, we were very happy when a comprehensive FAA reauthorization was passed last year. Reauthorization required over 200 separate deliverables, nearly half of which were due within the first year of enactment. FAA is on track to meet or has met approximately 80 percent of those action items. We have fully completed about half of the deliverables in the law. Now, as I'm sure you can appreciate, all action items are not created equal. Some are very complex and require a good deal of input from our workforce and industry partners. I believe that meaningful collaboration is the only way to achieve a workable path forward. Doing what we need to do to get the most effective work product is our goal, even if it means that certain deadlines are not met.

**Safety**

Safety is FAA's number one mission. Nothing is more important. Our system has never been safer. There has not been a fatal commercial passenger accident in the United States since 2009. I am proud of the hard work that has gone into providing a basis for achieving this level of safety. We need to make aviation safer and smarter through risk based approaches. The only way to prevent accidents before they happen is to accurately identify risk areas and work to mitigate them. That is the reason we are working hard to improve runway safety areas (RSAs) at commercial service airports. Some of the RSA improvements include the installation of the Engineered Materials Arrest System (EMAS). This soft concrete block system has been installed in RSAs at 45 airports in the U.S. These EMAS systems have already stopped eight overrunning aircraft with no

8

fatalities or serious injuries to passengers. Voluntary reporting for both FAA and industry employees, safety management systems (for both FAA and industry) and the creation of the Aviation Safety Whistleblower Investigation Office have also helped to prevent accidents. All of these efforts have been providing the agency with data and information to which we have never before had access. More information results in FAA being able to see trends and take action to mitigate the associated risks. Adjusting the safety culture to ensure employees that they can provide information without fear of reprisal is a cornerstone of our approach to safety.

Prior to Reauthorization, we had been working on the requirements of the Airline Safety and Federal Aviation Administration Extension Act of 2010. That act mandated rulemakings to revamp flight and duty time regulations to better address the issue of pilot fatigue, to increase the required number of hours of flight experience before a pilot can qualify to be a commercial pilot, and to revise pilot training to better simulate challenging conditions so that pilots can better handle serious, but rare situations. We completed the flight and duty time rulemaking just over a year ago, and plan to complete our work on the final pilot qualification rulemaking (the "New Pilot Certification and Qualification Requirements Final Rule") by August 2013 and pilot training (the "Qualification, Service, and Use of Crewmembers and Aircraft Dispatchers Final Rule") by October 2013. Reauthorization has since added a number of rulemaking requirements that we are also pursuing.

With respect to other safety directives in Reauthorization, FAA commissioned an Aviation Rulemaking Committee (ARC) to develop recommendations to improve our aircraft certification process: we delivered our Report to Congress on that effort in August of last year and have begun implementation of the report's recommendations. We also established an ARC consisting of government and industry experts to develop recommendations on improving the consistency of regulatory interpretations. We are in the process of finalizing a report informing Congress of the recommendations presented to the FAA.

Reauthorization also required a number of safety-related reports. We have delivered the report required on runway safety alert systems and the first annual report of the Aviation Safety Whistleblower Investigation Office summarizing the disclosures the office has received and how they were handled. In the upcoming weeks, we expect to issue reports on the National Service Air Carrier Evaluation Program, night vision goggles for helicopter pilots, improved pilot licenses, and limiting access to the cockpits in all cargo aircraft. We are also finalizing a report to Congress on common sources of distraction on the flight deck.

Pursuant to Congressional direction, we have also worked with the Occupational Health and Safety Administration (OSHA) to draft a statement of policy which permits some OSHA standards to be applied to improve workplace safety for aircraft cabin crew. We published a draft policy statement in the Federal Register in December of 2012 for comment, and are in the process of reviewing those comments.

10

Also in accordance with reauthorization, in October of last year, the FAA, in conjunction with the Department of State, issued a cable regarding international drug and alcohol standards for foreign repair stations.  An advanced notice of proposed rulemaking (ANPRM) is currently in executive review.


**Delivering Technology**

Our goal in the area of delivering technology is to efficiently and sustainably deliver benefits to our stakeholders and society.  One of the responsibilities of the Deputy Administrator is to serve as our Chief NextGen Officer, so that is one of many reasons I hope to appoint a Deputy relatively quickly.


Throughout Title II of the Reauthorization, there is a theme that modernization of the system must be done in collaboration with our industry partners.  FAA wholeheartedly agrees with this concept.  Imposing technological changes without the input of the users would be a recipe for failure. We continue to engage through our work with Optimization of Airspace and Procedures (OAPM) initiatives, which are being done in close collaboration with industry and stakeholders.  OAPM is actively working in nine of the 13 metroplexes identified in Phase 1 of the program.  Of these, one of the metroplexes (Houston) is currently in the implementation phase with two additional sites (Washington, DC, and North Texas)  planned to start implementation of the new procedures later this summer, depending on how sequestration impacts this plan.  The metroplex initiative optimizes procedures in a geographic area where there are a number

11

of airports, rather than focusing on each airport separately. Through this initiative, we are untangling our busiest airspace and creating more direct routes, cutting fuel, and becoming more environmentally friendly. In the congested airspace in the skies above our busiest metropolitan areas, these new modifications are being put in place in three years, much more quickly than the five to ten years it had taken previously. We are also actively engaged with our industry and government partners in the development of NextGen through the NextGen Advisory Committee (NAC). This group is helping to guide many aspects of our air traffic modernization work. The NAC also works with FAA on developing and tracking performance metrics and advising on the technical challenges of one of the new categorical exclusion provisions included in Reauthorization.

Reauthorization also provides FAA with the ability to consider using operational and financial incentives for commercial and general aviation operators to equip their aircraft with NextGen technology. We are actively engaging aircraft operators and potential private partners to assess interest and receive feedback on equipage incentive programs and how use of this authority could attract additional investment in NextGen technologies and training.

FAA has completed a departure queue management pilot program that was required in the statute in order to continue to advance plans to enhance surface management at airports. Also, in accordance with Reauthorization, we have issued guidance for AIP funding eligibility that supports the importance of sustainability initiatives in the way that

12

airports do business, and we expect to issue further guidance in 2013. We have also initiated a new study on the National Plan of Integrated Airport Systems, which is a long-established process for identifying strategic investments. The new study will ensure we are making the best use of available data in supporting our decisions to advance safety, capacity, efficiency, and sustainability initiatives.

Finally, in February, pursuant to Reauthorization, the FAA requested proposals for interested state and local governments, eligible universities, and other public entities to develop six Unmanned Aircraft Systems (UAS) test sites around the country, which will gather information to help inform research, development, operational and privacy issues. We expect to select the six sites by the end of the year. These sites will conduct critical research that will help determine how best to integrate UAS into the NAS. Once the sites are operational, we expect to learn how UAS operate in different environments and how they impact air traffic operations. I know this Committee is very interested in UAS integration. Use of the six sites will provide us with essential information to facilitate integration of UAS into the NAS and to address outstanding issues, such as privacy. Prior to finalizing the FAA's UAS five-year "Roadmap", the FAA is coordinating the roadmap with other UAS stakeholder agencies and ensuring alignment of that roadmap with the Joint Planning and Development Office's Interagency Comprehensive UAS Plan.

13

### Empower and Innovate FAA's Workforce

In the current fiscal climate, we have to find a way for FAA's employees to work smarter and enhance our productivity. You tasked us to undertake a thorough review of each program, office, and organization within the agency. Our report on FAA Review and Reform highlights 36 initiatives to improve and update processes, eliminate duplication and waste, and make the agency more efficient and effective. The initiatives identified cover many aspects of our operations and include improvements to cost analysis, governance, acquisition processes, standard operating procedures, and human resources. Of the 36 initiatives, 16 have been implemented and 20 are in progress. In addition, we are actively engaging our employees in the development of recommendations for facilities consolidation and realignment.

At your direction, we are looking closely at improvements to staffing and training for our employees. Four studies are underway looking at frontline manager staffing, technical training and staffing, air traffic controller staffing and air traffic training and scheduling. Due to the requirement to produce the plan by March 31, 2013, the interim workforce plans we submitted last month do not reflect the potential effects of sequestration. The FAA will adjust the actual staffing and hiring forecasts to reflect future funding levels as they become available. Finally, in accordance with Reauthorization, we developed staffing standards and scheduling plans for New York City and Newark air traffic control facilities. We are in the process of considering impacts of sequestration to staffing concerns.

14

## Develop and Fund the Efficient FAA of the Future

FAA must not only meet our day to day responsibilities, we must also look to the future and figure out how to shape the agency to meet the demands and opportunities of the future. As noted earlier, the U.S. aviation system is going through significant, even revolutionary changes. NextGen is a major transformation which will increase our efficiency and safety, reduce delays and reduce fuel consumption. UAS have the potential to change the face of aviation. In the midst of these changes, budget pressures are making us ask hard questions about what the FAA needs to deliver in the coming years to ensure the safety and efficiency of the NAS and how to do it most cost-effectively.

In addition, we will face major changes in our workforce in the coming years. About one third of FAA employees will be eligible to retire starting in 2014. So for us, succession planning remains a crucial aspect of the agency's focus, and we realize that we will begin to lose a vast amount of corporate knowledge in the coming years. To prepare for that, we must impart this knowledge to today's emerging leaders and experts to ensure a successful agency in the 21st century. We need to embrace innovation and to work efficiently.

Efficiencies are not just for the future. Given the economic challenges we are facing, FAA has worked very hard to find cost savings and we have been quite successful. In fiscal year 2012, FAA efficiencies and cost cutting resulted in $81 million in savings.

15

Prior to sequestration, we have set a target of $91 million in cost savings for fiscal year 2013. We recognize that the status quo is not an option and we will continue to strive to achieve additional efficiencies moving forward.

Finally, we must chart innovative and collaborative ways to engage with all segments of the aviation sector, from airlines to association groups, to general aviation, to unions. We must embrace the opportunity to make long-lasting changes together that ensure a vital and vibrant aviation industry that serves the needs of this nation.

**Advance Global Collaboration**

The world is increasingly interdependent, so international collaboration is essential if we want to move forward effectively. FAA needs to continue to work with international partners to improve global aviation safety and sustainability. This effort will require us to improve the harmonization and interoperability of new technology with international aviation standards and procedures to improve safety on a global basis. We need to work to ensure the roadmaps agreed to by the International Civil Aviation Organization (ICAO) to advance communications, navigation, and surveillance improvements for global air navigation are compatible with our NextGen concepts and implementation and our domestic regulatory plan. We are working at ICAO to find practical and collaborative solutions to address aviation's greenhouse gas emissions and are encouraged by the European Union decision to "stop the clock" on application of their emissions trading system on foreign airlines. Our international partnership will require us to develop and begin to implement a strategic plan for technical assistance, training,

16

and other activities to maximize the value of FAA's expertise and United States resources. The FAA is committed to working proactively with countries around the world to create the initiatives and achieve the outcomes we need in the areas of safety, air traffic management, and the environment to foster a safe, efficient and sustainable global aviation sector.

## Conclusion

Let me conclude by saying that it is essential to the effective management of FAA's programs to have stability and predictability that can be relied upon. The many extensions over the last few years took a toll on FAA's work in certain areas. Now we face an even more extreme uncertainty under sequestration. All of us in this room want the same things. We want to get better at what we do, think smarter, improve safety, streamline processes, and remain the agency that can work collaboratively with the world to develop safer and more efficient practices. Sequestration will not stop us from trying to attain these goals, but it will make it much, much harder.

Mr. Chairman, this concludes my statement. I will be happy to take questions at this time.

Westlaw.

2013 WL 1622440

2013 WL 1622440

Roll Call, Inc.
Copyright (c) 2013 Roll Call, Inc.

Verbatim Transcript
April 16, 2013

Senate
Committee on Commerce, Science and Transportation
Committee Hearing

Sen. John D. Rockefeller IV Holds a Hearing on **Aviation** Safety

 SENATE COMMITTEE ON COMMERCE, SCIENCE AND TRANSPORTATION
HOLDS A HEARING ON **AVIATION** SAFETY

APRIL 16, 2013

SPEAKERS:
SEN. JAY ROCKEFELLER, D-W.VA.
CHAIRMAN
SEN. BARBARA BOXER, D-CALIF.
SEN. BILL NELSON, D-FLA.
SEN. MARIA CANTWELL, D-WASH.
SEN. FRANK R. LAUTENBERG, D-N.J.
SEN. MARK PRYOR, D-ARK.
SEN. CLAIRE MCCASKILL, D-MO.
SEN. AMY KLOBUCHAR, D-MINN.
SEN. MARK WARNER, D-VA.
SEN. MARK BEGICH, D-ALASKA
SEN. RICHARD BLUMENTHAL, D-CONN.
SEN. BRIAN SCHATZ, D-HAWAII
SEN. WILLIAM "MO" COWAN, D-MASS.

SEN. JOHN THUNE, R-S.D.
RANKING MEMBER
SEN. ROGER WICKER, R-MISS.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

SEN. KELLY AYOTTE, R-N.H.
SEN. ROY BLUNT, R-MO.
SEN. MARCO RUBIO, R-FLA.
SEN. DEAN HELLER, R-NEV.
SEN. DAN COATS, R-IND.
SEN. TIM SCOTT, R-S.C.
SEN. TED CRUZ, R-TEXAS
SEN. DEB FISCHER, R-NEB.
SEN. RON JOHNSON, R-WIS.


WITNESSES:
MICHAEL PETER **HUERTA**,
ADMINISTRATOR,
FEDERAL **AVIATION** ADMINISTRATION,
DEPARTMENT OF TRANSPORTATION

DEBORAH A.P. HERSMAN,
CHAIRMAN,
NATIONAL TRANSPORTATION SAFETY BOARD

GERALD DILLINGHAM,
DIRECTOR OF CIVIL **AVIATION** ISSUES,
GOVERNMENT ACCOUNTABILITY OFFICE

JEFFERY GUZZETTI,
ASSISTANT TRANSPORTATION INSPECTOR GENERAL

ROCKEFELLER: Ladies and gentlemen, this hearing will come to
order.
And, hopefully, there'll be some senators who arrive. But you've got
the two best ones right here. Let me make my statement.


Americans take the safety of their **aviation** system for granted,
and they should, given that all too often, air travel is a difficult
experience. Safety is the last thing passengers need to worry about.
There are certain expectations built into modern air travel. Airline
passengers expect their pilot is experienced and rested, that their
air craft has been properly maintained, and the air traffic
controllers will guide their plane safely through the skies.


But the industry and regulators should never take the safety of
the system for granted, nor should we. I know that none of us in this

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

room take it for granted. Everyone here today is deeply committed to
**aviation** safety. That's the job of many of you in the interest of all
of us.

Our strong **aviation** record did not happen overnight. Everyone
involved has worked hard to cultivate a strong safety culture. The
FAA, air craft manufacturers, and airline employees all hold safety as
their number one priority, as do we.

Congress has spent a considerable amount of time in the last few
years strengthening the FAA, really battling to strengthen it
financially and substantively. It was not easy, but we got it done.
And the **aviation** system would become even safer because of the FAA
Modernization Reform Act that we did, in fact, pass last year and the
Airline Safety Act which we did, in fact, pass in 2010.

As you are well aware, our goal was to make certain our **aviation**
system continues to be the safest, most efficient, and modern in the
world. The FAA has made considerable progress implementing many of
the safety initiatives in those bills. And the agency is to be
commended for that effort.

But now all of the progress that the FAA has made is at risk.
Sequestration is not our friend, and it's affecting every aspect of
the FAA's operations or perceived operations as people try to figure
out what's going to happen.

I also share my colleagues' frustration with the lack of
transparency, frankly, on how the agency made this decision and how it
intends to implement budget cuts. A great deal of attention has been
placed on the potential closure of 149 air traffic control towers,
including four in West Virginia. I've expressed my concerns about the
impact of closing those towers on the airports and the communities.
They've expressed their concern to me, clearly. I know my colleagues
share these concerns, and we will likely be discussing that today.

But, again, there is frustration from some of us about the lack
of transparency on how the agency made this decision, how it intends
to implement, generally, the budget cuts. We need to have a better
understanding of the specifics. What I do know is that if we fail to
reverse the decrease in FAA's budget, we will not have an **aviation**
system that we need to compete in a global economy.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

I -- I made that speech last week, and I'll probably make it again today. Why is that we are so directly destroying our infrastructure and our possibilities of -- of growth and modernization? It -- it -- it's incomprehensible, but there it is.

The hard choices that the FAA has to make to implement the sequester will only be magnified this October, when the next fiscal year begins. I know that the agency will never sacrifice safety, but it will be forced to limit every aspect of the system's operations. The implementation of NextGen will be delayed. That's awful and dangerous. But it's going to be delayed. Our air space industry will suffer as certification of new technology and equipment is slowed. More towers could be forced to close. And critical safety rule making such as pilot training and qualification standards will take longer.

One of the reasons I have so aggressively advocated for moving to a digital satellite-based system with the NextGen program, is that it will make this system safer. I know that the FAA will never compromise safety. But the erosion of FAA's budget directly impacts our ability to compete next -- complete NextGen and other safety initiatives. Something has to give somewhere. Our problem is we don't know what that's going to be.

ROCKEFELLER: It threatens our ability to make the continuous improvement in **aviation** safety that we have made since the Wright brothers. Unlike other transportation systems, we have a comprehensive plan to move our **aviation** system into the 21st century, but our unwillingness to raise sufficient revenues to pay for it means that we will fall further and further behind. You fight, fight, fight like we did last year and the year before to move ahead. They'll pass it, just barely, you get ahead. And then all of a sudden, we're falling behind.

We face difficult budgetary situations. We need to make the necessary investments in our transportation networks. I don't think anybody would dispute that. But is it happening? No. Is there a possibility of this happening? Maybe, but not likely.

The United States has been the world's **aviation** leader for over 100 years. We risk that global leadership position if we're unwilling to continue to invest in it. You can't invest in something with goodwill, good wishes. It's called revenue. It's called money.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The situation with the lithium battery on the Boeing 787 is a
perfect example of where the regulators identified and acted swiftly
to address a serious safety problem. The company and the FAA are
evaluating solutions that I hope will soon be proven workable.

Although the situation with the 787 has dominated the news, the
FAA is currently working with the **aviation** community to actively
identify and address potential risks before they result in an
accident. The agency is working with controllers and pilots to
increase reporting of errors so we can learn from our mistakes. We
are putting the future safety of the system at risk if we're unwilling
to sustain our commitment -- if we are in that condition that we are
not willing to sustain our commitment to these critical effects.

Everyone agrees that these are vital programs, that they will
directly improve the safety of the system. Do we really want to slow
down these initiatives? I'm not willing to settle for the status quo
on **aviation** safety. Maybe we'll have to. It's a terrible situation.

I will seek to maintain the necessary level of funding for the
FAA and its critical missions as we continue our efforts to address
our broader fiscal issues. I appreciate the budgetary situation is
forcing the federal government to make difficult choices, but those
choices still must be smart, driven by good policy and not damage our
long-term economic competitiveness.
It's a continued commitment to safety that makes the U.S.
 **aviation** system the safest in the world. We've seen that in recent
months. Safety has to come above all else. There is no number two.
There is only number one. And I'm confident somehow -- for what
reason, I can't explain -- that this is going to continue.

I call upon my distinguished ranking member and good friend, John
Thune.

THUNE: Thank you, Mr. Chairman, and thank you for holding this
important hearing.

**Aviation** safety has to be the FAA's top priority and it's
certainly a top priority of this committee. Today's hearing is a good
opportunity to review the FAA's progress on a host of **aviation** safety
issues, including mandates from both the Airline Safety and FAA

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Extension Act of 2010, and the FAA Modernization and Reform Act of
2012.

The first of these laws, enacted in response to the tragic loss
of life related to Colgan Flight 3407, included several safety reforms
for the airline industry. The FAA has made progress in implementing
some of these reforms, most notably the issuance of the flight and
duty time rule for airline pilots. However, several initiatives are
either behind schedule or otherwise incomplete.

In particular, I hope that Administrator **Huerta** will be able to
give the committee an update on the pilot qualifications rulemaking,
as well as a progress report on the agency's effort to develop the
pilot records database as directed by the law. I also look forward to
hearing from the Department of Transportation's Office of Inspector
General, which has been tracking the FAA's efforts to meet the
requirements of the Airline Safety Act.

Most recently, Congress enacted the FAA Modernization and Reform
Act of 2012, which included additional provisions to improve safety.
Among other things, the law directed the FAA to develop a strategic
plan to address runway safety. The Government Accountability Office
has found that the rate of runway incursions has trended steadily
upward in recent years. And the National Transportation Safety Board
has again placed improving the safety of airport surface operations on
its most wanted list. I look forward to hearing from all of our
witnesses about ongoing efforts to increase the safety of our runways
and what remains to be done.

Of course, we cannot examine **aviation** safety without discussing
the recent incidents involving the Boeing 787 Dreamliner. While the
NTSB continues searching for the root cause of the battery failures
that led to a grounding of the jets, the FAA has now approved Boeing's
proposed certification plan that will hopefully address factors that
likely contributed to the failures.

I understanding testing of the design changes have been completed
and FAA is analyzing the results. I'm eager to hear about the current
status of the two ongoing efforts, as well as an assessment of what
this case says about how the two entities work together.
Finally, much has been made and said in recent months regarding
the potential impact of the sequestration spending reductions on

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**aviation**. While this is no surprise to many at today's hearing, I'm concerned that rather than sharpening their pencils and finding budget reductions that inflict as little pain as possible on the traveling public, the administration has threatened to close air traffic control towers, slow down air traffic and furlough employees.

The president, the secretary of transportation and the administrator have all issued dire warnings about the possible impacts of the sequester. Now that the cuts are reality, it is my hope that agency leaders will take a second look at plans to implement budget reductions in a way that minimizes impacts on the traveling public and the economy. Airspace users have paid billions in taxes and fees that support FAA operations and they deserve better management of services provided.

This issue did not sneak up on anyone. During Administrator **Huerta's** confirmation process, the FAA failed to provide requested information to Congress and the American public about plans to carry out sequestration. This was true even after the president signed legislation into law last August that I authored, the Sequestration Transparency Act. And along with House Transportation and Infrastructure Committee Chairman Shuster, I've sent three letters to the Department of Transportation over the past six weeks to get detailed information about their sequestration plans.

Last Thursday, Chairman Rockefeller and I sent a letter, also signed by **Aviation** Subcommittee Chairwoman Cantwell and Ranking Member Ayotte, and our counterparts in the House, urging the FAA to target lower-priority spending to avoid contract tower closures. Yet despite those efforts, those of my colleagues to get straightforward information on the administration's plan for sequester, here we are with a lack of clarity and very little confidence that the proposed actions, widespread furloughs and tower closures, are the best or only way forward.

A letter from Secretary LaHood in response to only one of the letters, delivered late last night, leaves much to be desired in our efforts to gain more clarity on the decisions to close contract towers and the safety analysis conducted before administration officials decided to propose closure of so many air traffic facilities. I hope Administrator **Huerta** will take today as an opportunity to directly answer questions on this important topic and to work with committee

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

members on the best way forward to implement the sequester reductions
which amount to only 2.4 percent of overall federal spending for
fiscal year 2013.

Again, I want to thank you, Mr. Chairman, for calling this
hearing, and I thank all of our witnesses for their part in ensuring
the highest level of safety for the traveling public. I look forward
to your testimony.

ROCKEFELLER: Thank you, Senator Thune.

I would like to call now on Senator Cantwell and also on Senator
Ayotte, in sequence before they are both chairman and ranking member
of the **Aviation** Subcommittee, which is so important.

CANTWELL: Thank you, Mr. Chairman.

Before I get started, I just want to honor the victims of the
horrific incident that happened in Boston. And I know that all
Washingtonians, my Washingtonians, but all Americans also stand with
our friends in Massachusetts. Our thoughts and prayers go out to the
victims of this senseless tragedy and we honor the first responders
who help protect the lives of innocent Americans.

And I want to thank you, Secretary **Huerta**, for the FAA's rapid
response in quickly securing Boston's airspace, establishing temporary
flight restrictions over the immediate vicinity of the explosions.

Mr. Chairman, thank you for holding this important hearing. And
it's just been over a year since we passed the FAA Modernization
Reform Act, and there is a lot to do and talk about when it comes to
safety.

I want to thank the witnesses today, especially Administrator
 **Huerta** and Congresswoman -- Chairwoman Hersman for updating me
constantly on the FAA's and NTSB's review of the 787 battery issue. I
appreciate the intensity and focus that both of your agencies have
provided for the important **aviation** issues. I look forward to
continuing being updated on this issue.

I also want to thank Mr. Guzzetti for his technical assistance on

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

the medical safety legislation when you were at NTSB several years ago, and Mr. Dillingham for your institutional knowledge on **aviation** issues. They're very welcome.

While we're here today to talk about key safety initiatives, there is also a lot to talk about when it comes to sequestration impacts on safety and operations of over 200 air traffic towers slated for closure. I appreciate my colleague's efforts, Senator Moran, to try to restore funding. In my home state, eight towers are on the closure list and these closures cause major disruptions. For example, at Felts Field in Spokane, which is an area that serves both air medical services for four states, and and also Paine Field in Everett, which is the hub of a large aerospace manufacturer, these tower closures would have an impact.

So I hope, Mr. Chairman, we can resolve these issues.

Mr. Chairman, prior to your chairmanship, you were the ranking -- chairman and ranking member of the **Aviation** Subcommittee for more than a decade. And during that time period, you left a legacy of achievements on **aviation** safety. As a testament to the work of this committee and the work of key agencies and industry players, there have been no major domestic crashes in major airlines in more than a decade. And in response to the smaller Colgan crash that has been referred to by my colleagues, your committee held nine hearings, passing meaningful reform legislation in 2010, some of which has been implemented, but other parts require final action.

For one, the FAA must implement the rules required by your legislation, including pilot qualifications, pilot training, pilot mentoring and professionalism, database issues, and other safety **aviation** issues, including ensuring that regional carriers meet the same safety standards as major airlines, addressing air traffic controller fatigue issues, reducing operational errors, including runway incursions, and improving general **aviation** safety, completing the medical safety rules, and integrating unmanned aerial vehicles, and improving the voluntary reporting system. And we also must remember that there are a number of safety initiatives in the NextGen system as we move forward on that.

But last month, the NTSB released its interim factual report on a key issue, the lithium ion battery incident aboard the Boeing 787 at

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Logan Airport operated by Japan Airlines. And next week, the NTSB will be holding a symposium on that issue. The FAA has been performing a comprehensive review of the 787's critical systems, focusing on the electrical system. And since April 8th, the FAA has been evaluating Boeing's test results on a modified battery.

So the NTSB ongoing investigation is important and the interim factual report provides information regarding the incident at Logan Airport, including descriptions of the damage in components and planned ongoing investigations.

CANTWELL: So Mr. Chairman, I look forward to receiving these final reports and recommendations by all entities. And like everyone else, we want these planes to return safely to flight and, yes, there are many people in the State of Washington, over 85,000 people directly and thousands of others indirectly a part of the supply chain, I can guarantee you they want to get it right.

The FAA and NTSB are doing their respective jobs on this issue and I thank them for that and the many, many hours that both of the agencies have put forth.

Mr. Chairman, I look forward to working with you on a myriad of these **aviation** issues over the next several months, but I know, you know, we have talked about this.

We want to continue to hold hearings on the NextGen oversight, the proposed American Airlines-U.S. Airways merger, competitiveness in the aerospace manufacturing development of airline strategies to foster industry growth and maintaining and upgrading our important airport infrastructure.

All of these issues are part of our safety mechanisms as well so I thank you for holding this important hearing. I look forward to the witness' testimony today. Thank you.

ROCKEFELLER: Thank you, Senator, very much.

Senator Ayotte.

AYOTTE: Thank you, Chairman Rockefeller, and I want thank you

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

for the opportunity to deliver an opening statement today. I'm
pleased that you decided to hold this hearing.

And I wanted to thank all of our witnesses for being here and I
would echo the sentiments of my colleague, Senator Cantwell, for the
important work that you've done in the light of what's happened in
Boston.

And, certainly, my thoughts and prayers are with all the victims
in Boston and all those who, unfortunately, were there for a very
positive event that was interrupted by such a horrific tragedy.

I want to begin my remarks, certainly, by expressing my
excitement to serve as the ranking member on the **aviation** subcommittee
and I certainly look forward to working with Senator Cantwell as we
have hearings on the topics that you've raised and I look forward to
working with you, Senator Cantwell.

In this role, I certainly look forward, also, to working with
Ranking Member Thune in making sure that we develop and as well as the
chairman of the committee to develop sound policy prescriptions for
many of the important issues that come before this subcommittee.

As everyone in the room understands, there are a number of
significant safety issues facing both the industry and the traveling
public including number one, which has already been mentioned, the
impacts of sequestration.

I will also be particularly interested to hear from Administrator
 **Huerta** on the FAA's response to the sequester, including its decision
to close the airports that has already been discussed -- excuse me,
the air traffic control towers like the one at Boire Field in my home
town of Nashua, New Hampshire.

I am also a co-sponsor of legislation that would keep those
towers open, the Protect Our Skies Act, but I have to wonder if
whether -- why we had to bring legislation to do this.

And I would very much like to hear what the reasoning was for
closing these control towers versus other areas of the budget and
finding savings to address sequestration, particularly the safety
impact.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

I've already heard from those that are on the ground in Nashua,
New Hampshire, the potential impact of if we were to close that
control tower in my hometown.

The other issues that I think are very important for us to talk
about today are the simultaneous investigations by the FAA and NTSB
into the Boeing 787 program.

And I know we're all interested in learning about the status of
these investigations by the NTSB and the FAA and want to make sure
that we understand what the path forward is to make sure that these --
the Boeing 787 program can go forward safely.

So we appreciate hearing about that today as well as the FAA's
implementation of several safety rules including rules relating to
pilot duty and rest and pilot training.

While I was not a member of this body during the consideration of
the Safety Act of 2010, I've certainly heard a fair amount of input
from interested parties about the implementation of this act.

So I look forward to hearing from the FAA about the
implementation and status of its pending rule-makings.

After I was sworn in, just over two years ago, the first major
piece of legislation on the Senate floor was the FAA Reauthorization
Bill.

Looking back, that was an important exercise in this body in the
sense that we thoroughly debated a major piece of legislation,
consider amendments on both sides and ultimately passed a
reauthorization bill that was important to the safety of the American
public.

I hope over the course of this Congress with my colleagues that
we will find common ground to advance an **aviation** agenda that
continues to keep our airports and carriers healthy and our airspace
and the traveling public safe.

Thank you, Mr. Chairman. I look forward to hearing from our

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

witnesses.

And I want to thank all of you for being here and for what you do for our country.

ROCKEFELLER: Thank you, Senator.

The four witnesses we have are the Honorable Michael **Huerta**, who's administrator of something called the Federal **Aviation** Administration. It's a wonderful job. No stress whatsoever.

The Honorable Deborah Hersman, who's chairman of the National Transportation Safety Board.

Dr. Gerald Dillingham, director of Civil **Aviation** Issues, the U.S. Government Accountability Office.

And Mr. Jeffrey Guzzetti, assistant inspector general, Office of the Inspector General United States Department of Transportation. I hope that was accurate.

Mr. Administrator, we're going to start with you.

**HUERTA**: Thank you.

ROCKEFELLER: Welcome.

**HUERTA**: Thank you.

Good afternoon, Chairman Rockefeller, Ranking Member Thune, members of the committee. Thank you for the opportunity to be here today to discuss the FAA's progress on key safety initiatives.

As you are aware, this is my first appearance before you as administrator of the FAA. I appreciate the work of this committee and of the full Senate in moving my confirmation forward.

We have a great number of challenges and opportunities ahead and I look forward to enhancing our productive working relationship.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The FAA's number one priority is safety. It's our mission and we
focus on it 24 hours a day. First, let me briefly address the Boeing
787.

The company has redesigned the internal battery components and
conducted extensive testing. This includes limited test flights
without passengers using the redesigned battery prototype.
The FAA is currently reviewing these test reports and analysis to
make sure that the 787's new battery system ensures the safety of the
aircraft and its passengers.

Turning next to broader safety considerations, while **aviation**
safety encompasses many technical issues, we cannot overlook the role
of human beings in **aviation** and how they interact with sophisticated
technology.

In the last few years, Congress has given us much guidance on how
to advance **aviation** safety and we have accomplished a great deal. The
FAA overhauled flight and duty rules to guarantee that airline pilots
have the opportunity to get the rest they need to operate safely.

And we're increasing the required hours of experience a pilot
must have before operating the controls of any airline flight. We're
also finalizing a rule that requires more realistic training so that
flight crews can better handle rare, but serious scenarios.

The best way to enhance safety across the board is to improve the
safety culture of an organization. Part of this effort involves self-
reporting by our own employees on safety issues.

We put programs in place for air traffic controllers and **aviation**
technicians to report a problem or even a mistake they may have made
and not fear retribution. This makes the system even safer.

We're taking many actions to enhance safety across the board
including promoting safety management systems and sharing more data
between industry and the FAA.

By analyzing this data, we're able to identify trends and hazards
across the airspace system and mitigate issues before something
happens.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

As you know, we're in a very uncertain and unpredictable fiscal environment. The sequester is requiring the FAA to make significant cuts in services and in investments.

These cuts will impact air traffic control, NextGen implementation and our certification services. We're exercising all options to reduce costs, a hiring freeze, cutting contracts, cutting travel and other items not related to day-to-day operations.

One of our largest contracts is the Federal Contract Tower program. We've notified 149 airports across the country that federal funding for their air traffic control towers will end in mid June.

These airports have lower activity levels and together these contract towers handle less than 3 percent of the commercial operations nationally and less than 1 percent of the passengers.

Communities still have the option to keep their tower open if they're able to provide the funding and the FAA stands ready to help them with that transition.
I want to emphasize that as we undergo the difficult process of implementing the deep cuts required by the sequester, we refuse to sacrifice safety even if this means less efficient operations.

In addition to contract towers, large facilities will also be affected. To reach the figure we need to cut from our payroll, which is our largest operating cost, we have to furlough 47,000 of our employees for up to 11 days between now and September.

The furloughs will reduce controller work hours at all airports with FAA towers, but also at radar facilities across the country. Again, safety is our number one concern.

We will only allow the amounts of air traffic that we can handle safely to take off and land. This means that travelers will need to expect delays.

Today, we are meeting with air carriers to go over specific operational impacts related to the furloughs facility-by-facility.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Furthermore, our **aviation** safety inspectors will have to focus
their attention on the most pressing priorities and will devote their
time to overseeing current activities to ensure continued operational
safety of the existing fleet. These activities will take precedence
over new projects.

Our overarching principle in making these difficult decisions is
to maintain safety and to offer the best air traffic services to the
largest number of people, both now and in the future.

It's my hope and the hope of everyone at the Department of
Transportation that our leaders can work together to rally around our
nation's air transportation system and protect the great contribution
that civil **aviation** makes to our economy.

Mr. Chairman, this concludes my prepared remarks and I will be
pleased to answer any questions you may have.

ROCKEFELLER: Thank you, Mr. Administrator

And, now, the Chair of NTSB Deborah Hersman.

HERSMAN: Good afternoon, Chairman Rockefeller, Ranking Member
Thune and members of the committee.

I appear before you today during one of the safest periods in the
history of U.S. commercial **aviation**. Since the 2009 Colgan air crash
near Buffalo that killed 50 people, some 3 billion passengers have
traveled safely on U.S. airlines.

Despite the lack of accidents in U.S. commercial **aviation**, we
cannot be complacent. Today the NTSB continues to investigate the
January 7th Japan Airlines 787 battery fire at Boston's Logan
International Airport.

In the more than three months since that incident, the NTSB had
dedicated significant resources to the investigation. Here is what we
know: there were multiple internal short circuits in cell 6 of the
battery that initiated a thermal runaway which progressed to
neighboring cells.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

On March 7th, the NTSB published an interim factual report and released hundreds of pages of investigative material. Last week we held a forum to explore the use of lithium ion battery technology across all modes of transportation. We learned that these batteries are everywhere and that they can be very safe. But risks must be managed and mitigated.

Next week we will be holding an investigative hearing to focus on the design and certification of the 787 battery system. We will continue to provide factual updates on the progress of our work.

My full testimony provides more detail on needed safety improvements regarding pilot training, distraction and airport surface operations. But let me highlight for you this afternoon two areas of civil **aviation** that have not realized the safety gains of the air carriers and discuss the use of data, an invaluable safety tool.

The first area: helicopter emergency medical services or HEMS; currently we are investigating 11 HEMS accidents. Six of those have occurred since December.

HEMS operations are high pressure. Lives are on the line and decisions about whether to launch or not must be made quickly. Conducting a thorough risk assessment, improving training, weather monitoring and adding additional safety equipment can help ensure the safety of these flights.

A second area of concern is general **aviation**, which accounts for nearly 1,500 accidents per year and results in nearly 500 fatalities annually. What is especially tragic is that we see the same types of accidents over and over again and so many of them are entirely preventable.

Improving the safety of GA is on the NTSB's most wanted list of transportation safety improvements.

As part of our education and outreach to decrease these accidents, the board met last month to examine chronic problems that we see in general **aviation**. We've developed five safety alerts to pinpoint hazards and provide practical remedies. These safety alerts have been provided to you with my testimony.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Finally, at the NTSB, we continue to use and encourage the development of new sources of data and information to support our safety analysis. We have seen a very positive trend in collaborative efforts between regulators and the **aviation** community to generate and share data and information which can improve safety.

But let me be clear: the absence of accidents does not mean that our work is done. Safely defined gravity thousands of times each day requires constant vigilance. I look forward to answering your questions.

ROCKEFELLER: Thank you very much, Chairwoman Hersman.

And now Dr. Gerald Dillingham, director of civil **aviation** issues, U.S. Government Accountability Office.

DILLINGHAM: Thank you, Chairman Rockefeller, Ranking Member Thune and members of the committee. First I would also like to acknowledge that we are in the safest period of the modern **aviation** era.

This outstanding achievement is attributable to the dedicated and skilled men and women at FAA working together with other key stakeholders including manufacturers, operators and the oversight of the Congress. To build on this historic record, FAA is moving towards a greater reliance on proactive, risk-based safety approach with less reliance on a reactive or at-the-accident analysis of events.

This afternoon my statement focused on the progress and challenges that FAA faces as it makes this shift. The first is adapting its certification process to an ever-evolving **aviation** industry and, second, it's the collection and analysis of data that is critical for proactive risk management.

With regard to FAA certification processes, from our work, we've found that overall FAA does an excellent job of following its processes. However, FAA must continue to address longstanding concerns as well as emerging issues about its certification processes.

For example, industry has long expressed concerns about the variation in FAA inspectors and designees' interpretation of standards of certification and approval decisions.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

The situation could be exacerbated in the future by factors such as the physical restraints on the government's spending and the agency's ability to provide in-service training and attract the talent necessary to maintain up-to-date knowledge of industry changes.

For example, as **aviation** technology evolves, FAA will need new skills and tools to understand new aircraft or equipment during certification. The absence of these skills and tools could lead to delays in certification or misinterpretation of a regulation or standard.

In addition, while FAA has worked to manage the certification workload with the use of designees, there have been some concerns expressed about whether there is adequate oversight of the designees, particularly for the new organizational designation authorities or ODAs.

With regard to FAA's data collection and analysis for risk management purposes, our studies have identified a number of areas where FAA's risk-based oversight could be improved. For example, our research has shown that adequate data about runway excursions are not being collected. Runway excursions can be just as dangerous as runway incursions.
But without these data, FAA cannot assess or mitigate the potential risks. Similarly, the lack of complete data for incidents that occur in the ramp area, general **aviation** operations and the inspection of initial pilot training activities limits FAA's oversight and ability to target its scarce resources. And to understand the impact of its effort to mitigate risk in these areas.

For example, the rate and number of operational errors appears to have increased considerably in recent years. However, because of multiple changes in reporting policies and processes during that same time period, it makes it very difficult to know the extent to which the apparent increase in operational errors are due to more accurate reporting, an increase in the occurrence of incidents or both.

In response to our recommendation, congressional mandates and on its own volition FAA has efforts underway or planned to address each of the areas that I have identified as well as others listed in our written statement.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA Case #13-1140     Document #1431741          Filed: 04/19/2013     Page 73 of 125

I want to emphasize that these efforts will require sustained
attention and oversight to ensure that the agency's ability to
comprehensively and accurately assess and manage risk is not impaired.

In closing, Mr. Chairman, I would urge all stakeholders not to --
not to become complacent with the extraordinary safety record that's
been achieved to date and continues to do whatever may be necessary to
make a safety system even safer.

Thank you, Mr. Chairman.

ROCKEFELLER: Thank you very much, Dr. Dillingham.

And now Mr. Jeffery Guzzetti, is assistant inspector general,
Office of the Inspector General, United States Department of
Transportation.

GUZZETTI: Chairman Rockefeller, Ranking Member Thune and members
of the committee, thank you for inviting me to testify on FAA's safety
oversight efforts.

Like the other witnesses have just indicated, FAA operates the
world's safety air transportation system. However, our audit work
continues to identify opportunities for FAA to improve safety.

My testimony today is going to focus on three areas: one, the
need for improved air traffic safety data collection and use, the need
to strengthen risk-based oversight and, lastly, progress and
challenges with implementing mandated safety requirements.

First, FAA has recently taken steps to enhance the data
collection on air traffic safety risks, including controller and pilot
errors that result in separation losses between aircraft. However,
better data collection and analysis are needed before the agency can
establish an accurate baseline of errors, identify the trends and root
causes of those errors and initiate strategies to prevent those
errors.
For example, we found that FAA does not analyze all separation
losses that are obtained from their automated detection systems. FAA
also does not validate the losses that are reported through its non-
punitive self-reporting system, known as ATSAP. Addressing these
challenges will become even more critical as FAA integrates unmanned

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

aircraft into the airspace system.

Second, FAA faces challenges to maximize the safety inspector resources that it needs to focus its oversight on the greatest risks. One challenge is for FAA to overhaul its staffing model so that the agency can accurately identify the number of inspectors it needs and determine where they are needed most.

Currently, their model was unreliable due to a number of shortcomings with the data that it uses.

FAA also needs to ensure that inspectors are trained and equipped with effective tools to perform risk assessments of repair stations. In 2007, FAA implemented an oversight system to target higher risk repair stations; however, our recent review indicates that inspectors do not always use the risk assessment process.

FAA also needs to ensure strong oversight of its program that delegates to private companies the authority to certify aircraft and components.

Under this program, company representatives appoint individuals to perform this certification work on FAA's behalf without FAA's concurrence. This delegation of authority reduces FAA's oversight role and could diminish the agency's awareness of appointees' qualifications and their performance history.

Finally, FAA has made important progress implementing mandated safety initiatives since the tragic Colgan accidents. This includes advancing air carriers' use of voluntarily safety programs. For example, as of January 2012, FAA data showed that 70 percent of Part 121 air carriers participated in at least one voluntarily safety program and that figure is rising.

However, work remains to implement these programs at the smaller carriers. For example, only 12 percent of the carriers with fewer than 15 aircraft have flight data recording programs that monitor aircraft performance.

FAA also met an important congressional mandate by issuing a rule that imposes stricter rest periods for pilots. However, the new regulation does not address pilot commuting, a potential contributing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

factor to fatigue which we recommended FAA thoroughly explore.

FAA has also encountered delays in issuing rules related to pilot qualifications, crew training, and mentoring programs.

In addition, the agency must overcome obstacles to establish a pilot records database so that air carriers will have better background information on the pilots that they intend to hire. Concerns also remain regarding implementation of safety management systems by small carriers, and information sharing between co-chair partners.

In conclusion, we will continue our reviews of FAA programs and work with the FAA and the department to ensure intended safety improvements are realized.

While FAA has made significant progress in many areas, we remain concerned that serious controller errors, runway incursions, and other incidents are on the rise.

To maintain a safe airspace system, FAA must improve its use of safety data, establish effective risk-based approaches for oversight, and fully address congressional mandates.

This concludes my statement. I would be happy to address any questions you or any other members have.

ROCKEFELLER: Thank you very much, sir.

We will proceed to questions based upon the order of arrival.

And so, the first one -- Mr. **Huerta's** [****] is to you.

You got to cut $627 million from the FAA budget in the remaining six months of this fiscal year.

Initial cuts include the closing of more than 100 contracted air traffic control towers. The elimination of midnight shifts. There are 60 other air traffic [****] towers.

The agency will also furlough its employees for 11 days starting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1622440

April 21st.

In addition, the FAA recently provided information [****]
need to make cuts of $486 million to the operations account, $142
million facilities and equipment account. NextGen -- NextGen programs
are getting cut by about $3 million, but the furloughs will have an
even greater impact on that program because hundreds of subject matter
experts, including air traffic controllers, will have to forego their
work in this area to return to their core activities, if I'm correct
on that.

So my question to you, sir, is, how will the sequestration cuts
and furloughs affect critical safety activities such as oversight of
airline operations or the implementation of NextGen and the
certification activities of the agencies or any other concerns you may
have?

**HUERTA**: Mr. Chairman, two principles have guided us as we have
looked at the impact of the sequester the current fiscal year. And as
you pointed out, we have to identify cuts, so it's $637 million in the
remaining six months of the year. And our budget is -- a budget --
we're an operating agency. 70 percent of our operation's budget is
people. 84 percent of its operations are in the field, in the
facilities, that actually deal with the flying public.

Sequester, as you know, is designed to be a blunt instrument, and
we have limited flexibility in terms of how we can apply it. We have
to apply it by program, project, and activity within the various
accounts within the FAA's budget.

Our overriding principle is first and foremost to maintain the
highest levels of safety. And second, to minimize impact on the
maximum number of passengers.

Our approach has been to focus first in contractual areas, out of
pocket expenses, and we have had tremendous reductions in such things
as travel, training, and information technology services.

In addition, we're also focusing on how we can look at our
contract base first to see if there are cuts we can take that would
enable us to maintain the safety of the system while at the same time,
preserving essential people-related services.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Nonetheless, we have been forced to look at reductions in service
at facilities that have lower levels of activity.

When we looked at air traffic control towers, what we focused on
were towers that had less than 150,000 annual operations and 10,000
commercial operations.

I should point out that we have thousands of public use airports
that operate in the country every day in a non-towered capacity,
including several thousand public use airports.

It is not unsafe, but the rules of how such a facility operates
are different. And in order to maintain the highest levels of safety,
what you sacrifice is efficiency.

As we have -- in addition to focusing on these lower activity
facilities that are covered by contracts, given the large percentage
of our budget that is made up of payroll expenses, the only way we can
get to the number we need to cut is to focus on reducing our payroll
expense. And that's what brings us to the furlough.

The furlough affects all of our personnel across the FAA, except
those exempted, which is our airport improvement program.

And -- and those are exempted under the sequester law itself.
That's air traffic controllers, technicians that maintain **aviation**
equipment, and **aviation** safety inspectors.

The impacts on large facilities will be a reduction of about 10
percent in available hours to operate an air traffic -- large air
traffic control facilities.

ROCKEFELLER: Could you say that again, please, sir?

**HUERTA**: A reduction of about 10 percent of available controller
towers. That's one furlough day per pay period. That's one of 10
that exist in every two pay periods. Those have been provided to the
facilities to build their schedules based on availability of
controller towers.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

We would expect that those will result in significant delays in
the larger facilities. The actual impact is very specific to the
airport in question, It depends on the airport's configuration, how
it is staffed, and what its traffic count looks like.

But you've heard me say in the past that large airports could
expect delays of up to 90 minutes in peak travel periods.

These are a serious of bad choices, but the way the -- the
sequester law is designed, we have limited flexibility in moving funds
between accounts.

You asked about the impacts on NextGen.

In order to preserve hours for the core operation, as you pointed
out, we have pulled back individuals that work in collaborative to
plan for implementations of new technology back to their home
facilities. So we have them available to work traffic and to provide
needed safety oversight.

What that means is, a lot of the operational testing that we do
to implement new technologies is something that gets delayed as a
result of that.

These are -- these are all difficult decisions we need to make.
And we are hopeful that we will be able to resolve the sequester, and
as we go into fiscal year 2014, and even later this year, that we will
be able to recover some of the lost ground that we're losing as a
result of these activities. Because **aviation**, as you know, represents
$1.3 trillion to our national economy. And we need to do everything
that we can to support it.

ROCKEFELLER: But if things get better, as you say, you're still
constrained by a budget previously passed, are you not?

**HUERTA**: In the current year, our -- for fiscal year 2013, our
budget is effectively the continuing resolution amount, which is the
fiscal '12 level less the sequester. And the president has put
forward a proposed budget for 2014 that, if adopted, would provide
adequate resources to maintain the operations of the FAA, and the
needed investments of next year.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

But we have to see how...

ROCKEFELLER: As they were last year?

**HUERTA**: I'm sorry?

ROCKEFELLER: As they were the last fiscal year?

**HUERTA**: Yes.

ROCKEFELLER: OK.

Oh. I'm way over my time. I apologize. Excuse me.
(UNKNOWN): You have the chair (ph)?

(UNKNOWN): You want to keep going?

ROCKEFELLER: No, no.

THUNE: All right, thank you, Mr. Chairman.

I'd like to, if I could, get a response to the -- the question
having to do with Coleman (ph) 3407, an accident that happened four
years ago.

Congress directed the FAA to conduct several rule makings to
improve airline safety. Among them was the pilot qualifications rule.
The bill we passed required the FAA to issue a rule within three years
to increase pilot experience hours to a minimum of 1,500 hours.

The law allowed FAA to give credit towards this minimum hours
requirement to those with relevant academic training. Without the
final rule, the 1,500 hour requirement will go into effect without the
equivalences included in the law, and that is not what Congress
intended.

My question is, will the FAA publish a final rule before the
August 1st, 2013 deadline with such equivalences?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**HUERTA**: Yes.

THUNE: Good.

I'd like to follow up on this -- these -- these budget issues and sequestration issues, which I think the chairman touched on on several levels. But there have been a number of questions that have been posed by myself and other members of this committee, requesting more detailed support for FAA's claims on the sequester reductions. And those requests for information have at best been answered with what I would characterize as incomplete responses.

And so, I -- my question, I guess, Mr. Administrator, is, how can you expect Congress and the public to trust the soundness of your decisions when you don't offer up concrete details to back up claims regarding the impact of sequestration on the national airspace system?

**HUERTA**: Senator Thune, the sequester law requires that we provide a detailed report, and we do intend to provide that once we've concluded our work on the implementation.

However, I will say that, as we have -- oh, and as I indicated in my opening statement, and in response to Chairman Rockefeller's question -- our focus has been to maintain **aviation** services and to minimize impact on the maximum number of travelers.

Much has been made about can't the FAA reduce its contract expenditures. Well, at the direction of this committee and with the support of industry, we have contracted out a large number of service operations that represent greater partnership with the private sector to carry out the needs of the **aviation** system.

For example, our largest contract -- close to $250 million -- is FAA's telecommunications infrastructure system. That is the communications system that allows all air traffic facilities to communicate with one another. And that was previously done by federal employees. That's now done by contractors.

Our second-largest contract was privatization of flight service station activities. These are essential services that are provided that give pilots briefings on weather and flight conditions, that enable them to have important information before they take a flight.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

And our third-largest contract area, as I mentioned, is contract
towers. We have achieved savings in areas -- $36 million this year
for I.T. We've reduced our travel budget by 30 percent. We have
completely eliminated training for an air traffic control cohort
during the summer months. That saves us money this year. It creates
a staffing problem for us potentially in the years ahead, but we have
to figure out how to manage through that.

Even with all of this, though, in a budget that is primarily
driven by people and people providing services, we have no choice but
to look at furloughs of our employees. As we reduce hours of
employees that are available to perform essential services, as I said,
our primary and overriding focus is going to be on safety.

And so in order to maintain the safety of the operation, it will
become more -- a bit more inefficient in high-traffic periods. It's
just the way the numbers work. We are a very people-heavy
organization and an organization that is focused on providing
essential safety-related services to the traveling public. To
maintain safety, we have to run a less-efficient operation.

THUNE: Well, let me ask you if you would consider or are you
considering making use of existing reprogramming and transfer
authorities when it comes to reducing the impact of sequestration on
air traffic control functions?

**HUERTA**: Yes, we have an existing authority, as you mentioned,
in order to transfer up to 2 percent within a particular type of
funding to fund essential services. And we have taken full advantage
of that flexibility in order to get our furlough impact on our
critical safety functions down to 11 days. And it would be my hope to
buy back more of those furlough days as we see how we -- how the
system plays itself out and how we're able to manage and find savings
on a continuous basis.

This is not a one-shot deal. We're managing this on a weekly
basis. And our efforts are, again, how do we minimize the impact on
the maximum number of travelers.

THUNE: What's -- what is your plan -- what does FAA plan to do
in F.Y. '14 when it comes to the proposed contract tower closures for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

this year? For instance, would the FAA continue those closures next year or utilize the flexibility you have to manage where those budget reductions come from next year?

 **HUERTA**: The president's budget, which has been put forward for fiscal year 2014, assumes that the sequester has been resolved. And if the president's budget is adopted by the Congress, we would have adequate funding for a contract tower program.

THUNE: How about if that budget is not adopted?

**HUERTA**: Then it depends on what the appropriators provide to us.

THUNE: But you would use that flexibility in a future year, if the appropriators give you that flexibility.

**HUERTA**: If in a future year, appropriators provided budget flexibility, we would have to see how it's allocated -- what it looks like and what flexibilities we actually have to move money around. But whatever Congress provides to us, we will work within it.

THUNE: My time has expired, Mr. Chairman. Thank you.

ROCKEFELLER: Thank you very much.

Senator Blunt?

BLUNT: Thank you, Chairman.

Mr. **Huerta**, you mentioned that you had worked to find enough flexibility so that essential employees would have fewer furloughed days. Is that right?

**HUERTA**: Not exactly, sir. What the budget -- what the Sequester Act provides for us and our Appropriations Act provides is funding flexibility to move 2 percent of available appropriations across accounts.

BLUNT: Right.

**HUERTA**: And in doing that, what we did was balance-out accounts within the FAA with the focus on maximizing available -- availability

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

of air traffic controllers and **aviation** safety...

(CROSSTALK)

BLUNT: So are there some people at the FAA that will have more
furlough days than 11?

**HUERTA**: No.

BLUNT: So there's no priority for essential employees; just a
priority for all employees, if you could achieve it.

**HUERTA**: Actually, what we were trying to do was get down to 11
for the critical safety-related functions, which the nature of their
budgets were such that under -- without moving money around, they
would actually have a higher number.

BLUNT: Right. But you're telling me nobody is going to be
furloughed more than 11 days.

**HUERTA**: That is correct.

BLUNT: Right. So it was all functions not just -- it helped
with the critical functions since your view at this point is you treat
everybody equally.

**HUERTA**: Yes, there is an overriding principle of fairness that
we have to look at as well.

BLUNT: Well, now there's no overriding principle of fairness if
it's a bad weather day. You have a list of employees who have to
show up as a priority.

**HUERTA**: Sure.

BLUNT: And there's no overriding principle of fairness that day.

**HUERTA**: But let's take a bad weather day. One of the things
that -- that we have looked at is how do we greatly reduce --
significantly reduce what we spend on overtime. That's a very costly
way to staff facilities. And what we're preserving it for is exactly

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

those sorts of situations.

BLUNT: All right. Well, what I'm going to do is I've got a
piece of legislation that I've offered as an amendment to the C.R. and
I'll offer it again, which does prioritize the employees -- and you
have a lot of them -- that are essential safety employees.

I think President Obama in April of '11 sent a directive out, if
there's a government shut down, here are the employees that have to
show up. President Clinton did the same thing when there was a
government shutdown in 1995. And you might -- I ask -- I'm going to
ask you to look at that and see if it's something that you would --
would be able to look at and maybe even be supportive of because it
just essentially does allow some priority of essential employees.

My view is that the law will probably stand. And we can not have
a sequester if we just appropriate money below that number or if we
appropriate money above the number, then -- then I'd like to see what
we could to make this more workable.

On towers, have you had safety reports on the towers that you've
closed?

**HUERTA**: Yes, we have.

BLUNT: Could I get a copy of those?

**HUERTA**: What we've done -- what we've done in looking at the
tower closures is we have considered whether there are safety impacts.

BLUNT: I'm going to run out of time. Is that a yes or a no?
Can I get a copy of those?

**HUERTA**: We can provide you a response for the record.
BLUNT: And Mr. Dillingham, on towers that affect civil **aviation**,
most of those towers also have a combination of general **aviation** and
-- and commercial. How important is it to have that visual sense of
the ground?

DILLINGHAM: The opinion varies, but the majority of the people
that we've talked to are very concerned that their tower will be

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

closed and that we are not -- we are not at the point where remote
operations are as safe or appear to be as safe as if you have that
vision on the ground. Because the weather can be, you know, one way
at that airport, but if you are a long ways away and you don't have
the appropriate weather equipment, you won't be able to advise a pilot
and the situation is reduced as such.

BLUNT: But I think we also -- you're looking to figure out on
commercial **aviation** how you can have another tower handling takeoffs
and landings in a commercial site that the tower would be closed in.
Is that right, Mr. **Huerta**?

**HUERTA**: You would use what's called the TRACON -- terminal radar
approach control. There's three levels of facilities: the tower on
the airport, the TRACON which provides approach control, and a center
which provides high-altitude traffic separation. And the TRACON would
(ph) control tower in approaching a non-towered airport.

BLUNT: And what you wouldn't have there would be the visual
sense of the field, but with some standards -- what I want -- what I
want to be sure we do here is if some of these airports continue to
have commercial traffic, that don't have a tower, I want that to be as
safe as it could possibly be. But I don't want us to lead people to
believe that it's less safe than it is by saying a tower would be
better, but we could do it another way.

**HUERTA**: We're not doing anything that is not safe. But what it
does change is how the airport operates. And in general, what it
means is that there is greater separation between flights that are
operating in a non-towered environment. In order -- and what that
provides is a safe operation, but as I said, it is less efficient.

BLUNT: And my last question would be, you will direct your staff
to get these tower safety reports to me and anybody else who's asked
for them as quickly as you can?

**HUERTA**: We will provide you a response for the record.

BLUNT: OK. Thank you.

ROCKEFELLER: You've got your "yes."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

BLUNT: I usually stop at "yes."

ROCKEFELLER: Senator Cantwell?

CANTWELL: Thank you, Mr. Chairman.

Administrator **Huerta**, I -- I truly appreciate the fact of your willingness to become FAA administrator.

(LAUGHTER)

And it would have been enough of a commitment to be FAA administrator under the implementation of NextGen. That in and of itself would have been a herculean task. To take on this task in the midst of sequestration in addition is just another twist and turn. And you have gained a reputation in this town for being a straight-shooter. In my interactions with you, you've always been very information-rich.

And so I was hoping I could follow on with what some of my colleagues were talking about, at least in this first round, about this tower issue. Because first of all, the Department -- the Department of Transportation, with so many protected programs, it seems to me that the FAA is getting a disproportionate share of the impact. Is that -- is that an accurate assessment?

**HUERTA**: That is correct. The way the sequester law is written, it exempts about three-quarters of the budget of the Department of Transportation, essentially all the grants programs, which are primarily the Federal Highway Administration, Federal Transit Administration.

It also exempts our airport improvement program which is about $3.35 billion and so it does -- so therefore, the impact does fall disproportionately on the operating parts of DOT and notably the [****].

CANTWELL: And unlike, you know, some of the floor activity we had to do more surgical approaches with various aspects in the budget, the Moran Amendment which might have helped in this area wasn't

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

brought up, so you've been having to deal with this in a very blunt
way and so I have a couple of questions about that. On -- on this
tower issue, and I you both I've mentioned to you both in issues, and I
did in my statement earlier about both Paynefield (ph) in the middle
of a big commercial **aviation** manufacturer and Feltsfield (ph) in
Spokane which is in the same proximity of the Spokane airport and
Fairchild Air Force Base.

So, they may have gotten beat out by some California cities in
suing the federal government over proposed closures but they are going
to be close behind or join that case because they feel very strongly
about this.

You and I have had a chance to talk about this issue as it
relates to your analysis. But I have question, is -- in -- prior to
the agency's decision and then revoking it and then saying it'll be
implemented in June, was it the FAA's intention to remove the
equipment from these towers?

(UNKNOWN): No, we're working through all of those decisions on a
case by case basis and in some instances, local airports and sponsors
have asked if they could retain equipment. In some instances, there
is an interrelationship between, for example, communications equipment
in the tower, how it relates to the communication equipment at the
airport and so we're working through those with individual airport
sponsors.

CANTWELL: Well wouldn't that be very devastating to have this
equipment removed because then how would you go back to, you know, if
either the sequester issue was resolved or a community response was
activated, how would you deal with this loss of equipment. So I think
we need a clear answer about equipment as well. We hope the answer is
that the equipment stays.

(UNKNOWN): For -- for the most part, the equipment stays, but
there are certain limited circumstances where we might come to a
different conclusion there and can talk about specific facilities.

CANTWELL: Well, I think as my colleagues have mentioned, this is
a very important issue when a community of the significant size as
they're going to sue of this issues, I -- I take it very seriously and
I hope that, Mr. Chairman, we can resolve this issue either on the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

floor or some instance because I think while the public understands
tightening of the belt, I don't know that they understand that the FAA
within the Department of Transportation is taking a very direct hit on
this and I think that it has very -- various communities in -- in my
state concerned about it.

I wondered, you know, Mr. Guzzetti mentioned that part of this
safety culture and regime that we have to establish is implementing
the mandates of Congress. And so obviously, we did in a major piece
of safety legislation ask for various rules on qualification of pilots
and training and mentoring and database issues and, you know, a whole
sort of other things Mr. Dillingham mentioned this issue of runway
incursions and getting the right data.

So is the sequestration going to impact us getting those rules?

(UNKNOWN): Well, the rules have different schedules that they're
working on. I was already asked about the issue of pilot
qualifications and I said that we would make the August timetable for
that and we do intend to do so.

Another one that is an extremely high priority for us is the rule
related to crew member training and you'll recall at my confirmation
hearing last year, I committed to completing that rule by October of
this year. We are on track and we will complete that rule
[****]>

CANTWELL: So will -- will the sequestration affect any of the
rule making?

(UNKNOWN): In other rule makings, I would expect to see delays.
But what it depends on is availability of hours I have for people in
the rule making office and across the agency to do the needed work to
get these rules done in a timely fashion.

If I have fewer hours available to me, it does affect the full
scope of everything the FAA does.

CANTWELL: Well, as Mr. Guzzetti said, it's important to get
these mandates fulfilled.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

So anyway, Mr. Chairman, we'll -- I think we need to keep looking
at this issue.

I know my time has expired, but it's important to understand what
isn't going to be done, you know, during sequestration as these
important rules that we mandated, we -- we want to see them
implemented.

I -- I didn't even mention the cargo, you know, issue. You know,
we've implemented rules but people who are flying in our skies want to
know that those who are flying cargo planes also need the same kind of
standards as other pilots for fatigue and operations.

So thank you, Mr. Chairman.

ROCKEFELLER: Thank you Senator Cantwell.

Senator Ayotte?

AYOTTE: Thank you, Mr. Chairman.

Administrator **Huerta**, I wanted to ask you, again, also I know
you've been asked about the tower closure issue, but there's something
that I'm -- I'm trying -- I'm struggling with.

In terms of your criteria of which towers were closed and let me
give you an example in my own state, Boire Field in Nashua, New
Hampshire, that tower was slated for closure. Now it's been extended
to June.

**HUERTA**: Correct.

AYOTTE: We also have an airport in Lebanon, New Hampshire, that
has a contract tower -- it's operated in a contract tower and it is my
understanding that Lebanon has less traffic operations than Nashua.

Can you explain to me why one and not the other and what -- how
-- how you distinguish between certain towers, why one was closed and
why was one -- one wasn't?

I will also add, just as a -- as a overlay to all this, Lebanon

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

happens to be an airport that receives about 2.3 million in essential
air subsidies every year despite being only 67 or 76 miles, so about
an hour and ten minutes away from our much more -- larger airport, the
Manchester Regional -- Boston Regional Airport in Manchester, New
Hampshire.

And so can you help me understand what's the distinction? Why
close Nashua's tower? I certainly don't want you to close Lebanon's
too, but it seems a little arbitrary to me.

**HUERTA**: Nashua -- our -- overall, we have two flavors of
contract towers. We have the federal contract tower program and then
we have the federal cost share contract tower program.

If Lebanon is a federal cost share contract tower program, they
have funding that extends through the fiscal year and we would need to
make a decision at that point.

I -- I -- I will need to get back to you as to whether Lebanon
falls into that category.

With respect to Nashua though, like all the other contract
towers, it was a tower that fell below the 150,000 annual operations
and 10,000 commercial operations.

AYOTTE: Do you have operations that fall below the standard that
you just identified that are not contract towers but actually run the
-- the controlling is done by FAA employees?

**HUERTA**: We do.

AYOTTE: So in fact, I think the initial list proposed for
closure would have had about 238 towers under that standard, is that
right?

**HUERTA**: That would be correct.

AYOTTE: So why was the decision made to close all the
contracting towers versus the towers that had the FAA employees that
perhaps could have gone on to do other work?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**HUERTA**: It's a question of timing and that is it would be -- we would treat all towers having similar operations the same way. The contract towers enable us to achieve savings because of the contractual nature in the current fiscal year. It takes longer to close an FAA staffed tower.

AYOTTE: How much does it cost to run -- do the -- in terms of the FAA employed tower versus the contract tower? What is more expensive in terms of operations?

**HUERTA**: I think in general, they are comparable but they depend on how the facility is specifically staffed. Every tower is staffed with the positions set up differently.

AYOTTE: I would ask for the record, for a more detailed analysis of what the cost differential is between those.

And -- is -- was essential air services exempted from the sequestration?

**HUERTA**: We don't administer essential air services at the FAA. They're -- we can get you a response for the record from the department.

AYOTTE: So DOT administers...

**HUERTA**: DOT administers -- it's in the FAA's budget, but it's administered by the Department.

AYOTTE: So you don't know whether or not that was exempt from sequestration?

**HUERTA**: I do not.

AYOTTE: OK. I would appreciate an answer to that because there is over, of course, as I understand it, in looking how much is in essential air services, that's a pretty substantial amount of funding on an annual basis, particularly when we're looking at -- in fact, we're $218 million on the books to serve 117 communities for essential air service and yet, we're looking for $45 million to $50 million to keep the contract towers open. Isn't that right?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**HUERTA**: Yes.

AYOTTE: OK. I appreciate your getting back to me on that. And also the answer on why Lebanon versus...

**HUERTA**: Sure.

AYOTTE: ... Nashua and the cost differential.

Do you expect that we'll have to pay damages in the suits -- the law suits from these communities?

**HUERTA**: I can't really comment on the outcome of pending litigation.

AYOTTE: And if hypothetically we were to pay damages for breach of contract under these communities, it could -- it could potentially cost us more than the closures, depending on the level of the damages.

**HUERTA**: As I said, I can't really comment on pending litigation.

AYOTTE: OK. Well, I appreciate your being here today and I look forward to the follow up answers and thank you all for being here.

ROCKEFELLER: Thank you Senator.

Senator Nelson?

NELSON: We of course are trying to find results, Mr. Administrator. Would you consider cost sharing with the local governments on these contract towers?

**HUERTA**: Senator Nelson, about 50 communities have made proposals to pick up the costs associated with the contract tower program. And in those discussions with them, we're willing to look at whatever proposal a community wants to make.

NELSON: But your problem is one of dollars.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

**HUERTA**: My problem is one of dollars and in the current fiscal year, I have to find the same number of savings.

NELSON: Well, so the proposals that you have in front of you on cost sharing, you have not rejected?

**HUERTA**: The proposals that have been made for the most part are to pick up the cost of the tower as opposed to a cost share scenario that the local communities have offered to -- have asked would we be willing to negotiate an orderly transition so that there wouldn't be a gap in service; that if they could obtain the opportunity -- if they could somehow put together funding that would enable them to -- to secure local funding, would we hand-off to them and ensure that they would have no interruption in air traffic control services.

**HUERTA**: Those discussions had a lot to do with our decision to delay closure until June 15 to allow ample opportunity for communities to consider options such as those.

NELSON: By you delaying until June, are you still going to be able to save the money that you have to under the sequester?

**HUERTA**: It does reduce our savings by about $8 million.

NELSON: As you well know, there are airports and then there are airports. And some of these airports come from a wealthy community with a fairly sizable tax base, and then others do not. Is that something that you would consider with regard to cost-sharing?

**HUERTA**: We will consider what a community puts forward, but it comes back to the question of what are the total number of savings that I need to achieve. And I think that the other thing we also have to consider is treating communities equitably as we look at the full scope of impacts resulting from sequester.

NELSON: Well, you don't give me a lot to report back to my 14 airports. They are very grateful, by the way, that some of them that were going to be closed in April are not going to be closed until June. And so we'll continue to work on this. And unfortunately, I think most of us think that the sequester is not going to go away until the new fiscal year. So we are facing a problem, as we would say, in Florida, a problema (ph).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Madam Chairman, I want to ask you -- you've got a pilot study
going on at the Orlando Airport on runway status lights, so that if
suddenly an airplane gets onto an active runway that you've got an
inbound, that the lights change color to alert the inbound aircraft.
Has this proved to be a useful tool for pilots?

HERSMAN: Senator, I will comment on generally the runway status
light issue. The NTSB has made runway safety and surface operations a
priority. It's on our most wanted list. But the program that you're
talking about, the specific study is being handled by the FAA, but we
do think these runway status lights can help prevent runway
incursions. And I'll defer to the administrator on that.

NELSON: OK. Well, while you're still talking, let me just ask
you, what do you think since you're the head of safety? What do you
think about the closure of the contract towers?

HERSMAN: You know, the FAA is faced with many difficult
decisions, as all of us are, as our budgets are impacted by what
choices they have to make. The NTSB has not looked at the safety of
-- of towers versus non-towered airports specifically. But I will
tell you that the reason why we enjoy such a good safety record in
 **aviation** is because of the redundancies -- the multiple layers of
safety.

And one of the things that we do know is when you eliminate those
layers, you can introduce risk into the environment. We have
investigated accidents that occurred with commercial service at non-
towered airports. We investigated an accident in Quincy, Illinois
where there was a collision on the runway between two aircraft. There
was a delay in getting emergency responders there because there was no
one there to report the accident. There was no one in the tower
there. It wasn't towered to report it.

And so there are safety benefits in the **aviation** system and those
redundancies are important.

NELSON: Runway status lights?

**HUERTA**: Senator Nelson, yes, runway status lights do show great
promise. We have a number of studies around the country. They are a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

difficult program to implement because they have to be carefully sequenced with construction programs at the airport. But as the chairman mentioned, runway incursions are an area of high priority not just for the NTSB, but also the FAA. And we have a number of technologies that we're testing. And they do show great promise for reducing runway incursions.

ROCKEFELLER: Senator Pryor?

PRYOR: Thank you, Mr. Chairman. And thank you for your leadership and concern about these issues.

I want to thank our panel for being here today. I know that you've been asked quite a bit about the contract tower program, but let me -- let me follow up just a couple of questions there.

What -- and if has been asked already, I apologize, Mr. **Huerta** -- but what communication is the FAA currently having with the contract towers selected for closing? Are you talking to them at all?

**HUERTA**: We've had a lot of discussions when we made the initial announcement. And we've had individual discussions with specific communities about how they would like to move forward. A number of communities, around 50 or so, have spoken with us very directly about would we be willing to work with them on a hand-off of responsibility for funding. And that is something that we've been taking quite seriously because if a community does want to step up and cover the cost of funding their tower, we very much want to work with then in that regard.

PRYOR: OK. But have you talked to all the communities that have been impacted?

**HUERTA**: Well, we've talked to the -- we've had a number of conference calls with the association that represents all the contract towers and we have provided regular communication to all the communities.

PRYOR: All right. Let me ask about your criteria and the things you considered when you did this. We have -- one example in Arkansas is we have Texarkana, Arkansas which straddles the line between Texas and Arkansas. And that airport has a limited line of sight. And did

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

you all take that into consideration when you -- when you made the decision about how important the tower is to that particular airport?

**HUERTA**: We did look at, in addition to the large criteria -- number of operations, number of commercial operations, how they serve or benefit an adjacent hub airport, how they are -- how they might relate in serving broader interstate objectives. And then looking at the facility itself, how they actually operate within the framework of -- of their day-to-day operations.

It is important to point out that every one of these towers except one is closed for a significant portion of every day. And so, they have existing rules of how they operate in a non-towered capacity. And therefore, when they convert to 24-hour non-towered operations, they simply revert to those rules.

Yes, it does have impacts on efficiency, as I've talked about, but there are close to 5,000 public-use airports in the country that operate every day in a non-towered capacity. The important thing is making sure that you have the procedures in place to operate in a safe fashion.

PRYOR: OK. Well, you mentioned, one of the factors you consider was whether they have commercial flights, et cetera.

**HUERTA**: Sure.

PRYOR: This particular airport in Texarkana also handles 5,000 military transits a year. You didn't mention the military in your statement. And this runway 04 has the only ILS back-course approach within range of several military training bases. So did you take military usage of the Texarkana Airport into account?

**HUERTA**: We consulted with the Defense Department and we did accept every one of their priority contract towers that they felt needed to be kept open.

PRYOR: We have a similar situation at the Fayetteville, Arkansas airport. The Little Rock Air Force Base is, I don't know, 150 or so nautical miles from there. And they -- the Little Rock Air Force Base is a C-130 training base. They like to land in Fayetteville because it's a little more urban. It's in a hillier, mountainous environment.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

And it does have a shorter runway. So did you consult the Air Force before you made that decision on Fayetteville?

**HUERTA:** We consulted with the Air Force to identify their priority towers nationwide. And we accepted every one that they identified.

PRYOR: OK. Have you shared the criteria that you've used with the airports? And the reason I ask is because Fayetteville -- the city of Fayetteville has told me that they've been unable to get your criteria that you used. In fact, they indicated that you really haven't shared much information with them at all.

**HUERTA:** One-hundred-fifty-thousand flight operations, 10,000 commercial operations -- that's the first cut, below that threshold. Second, do they serve a function that supports a large hub airport? Third, are there national security or national defense considerations that we determined in consultation with the Department of Defense and the Department of Homeland Security?

Beyond that, then it's -- one thing that we did not consider is impact on a local community. We did look at impacts that exist far beyond a local community.

PRYOR: Thank you, Mr. Chairman.

ROCKEFELLER: Thank you very much, Senator.

And now, Senator McCaskill?

MCCASKILL: Thank you very much, Mr. Chairman.

(CROSSTALK)

MCCASKILL: Beg your pardon?

ROCKEFELLER: [****] conversation [****] the White House. Am I right? I'm impressed.

MCCASKILL: No, I was not giving advice to the White House. I was yelling at someone.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ROCKEFELLER: OK, well [****].

(LAUGHTER)

MCCASKILL: And I came back to yell at poor Mr. [****].

(LAUGHTER)

I just got warmed up.

First, thank you all for being here. I appreciate it very much.
I have a thing about rules in the government, and that is they only
work if they're respected. And if the rationale for a rule is
specious or arbitrary, it not only is frustrating for people who are
impacted by the rule, it undermines every other rule that is
promulgated by the government.

MCCASKILL: Which brings me to the rule on personal electronic
devices on airplanes. It appears to me to not be grounded in any kind
of data or evidence, whatsoever. And so I would first ask you, Mr.
 **Huerta**, I have searched, I have asked, I have interviewed many, many
experts. My staff has. Is there some scientific data that is hiding
from my staff that would indicate a Kindle being on during takeoff
could have any possibility whatsoever of interfering with the
electronics of an airplane?

**HUERTA**: The question has more to do with, Senator -- First of
all, let me back up.

This is a matter that is of great personal interest to me. And
one of the things that I have asked is for our staff, through their
 **aviation** rulemaking committee, to look into the nature of these rules,
and are there things that we can do to change them in the future.

The rules that currently govern the use of portable electronic
devices have been around, as you mentioned, for a very long time. And
the current rulemaking framework is set up such that any airline can
conduct tests to determine if there are -- and prove that there is no
interference, and if that proof is made, then they would be free to
adopt the -- a program for portable records.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

MCCASKILL: And I'm aware of all that. That's, as you know, very impractical, for each individual airline to take on the cost of testing each individual instrument and making some certification to you on each individual interest -- instrument by each individual airline.

Let me ask it this way. Is the rule -- is this supposed to apply to general **aviation**?

**HUERTA**: The rule is -- that's a good question. The rule as it's currently designed is -- focuses on commercial **aviation**. And...I don't know. I'll have to get back to you on that.

MCCASKILL: Well, I will tell you that it is not followed in general **aviation**. People are not told to turn off their electronic devices because everyone who flies those airplanes knows that they're not a risk.

Let me tell you this story. This happened many, many times as I was on a lot of airplanes the last two years.

A woman who clearly was flying for the first time -- we were going out to the runway, and almost tearfully, she grabbed the flight attendant as she went by and said, "Oh, my God. I have left my cell phone on, and it's in the overhead."

She was very upset. And the flight attendant, of course, said what I've heard flight attendants say a million times, "Don't worry about it. Stay seated and in your seat belt." All right?

So, she knew that phone was on up in the overhead and we were taking off. She was crying in her seat, because she was sure she was going to bring down that airplane. And as you well know, there are dozens of people that inadvertently leave their phones on during takeoff and landing, or leave on something else during takeoff and landing.

The pilots are using iPads right now. These electromagnetic signals do not stack (ph). There is not any difference scientifically between one iPad in the -- in the cockpit and 400 in the airplane.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

And your people are still telling us that even if the ARC makes a rule
recommendation, that they're still going to recommend not [****]
-- just as much of a distraction as reading "War And Peace" on a
Kindle. At least on a Kindle, it would be a lot safer.

So this is a great example of a rule that really is arbitrary at
this point. And I am anxious for someone to document to me why there
is any reason that the flying public should be made to feel insecure
about someone next to them who hasn't turned it off quickly enough.

I don't think you realize the tension that's on an airplane
around this. I mean, the flight attendant's get tense. The people
who don't turn them off -- if somebody's sitting next to you, they
haven't turned them off, they get worried. They think they're going
to crash.

I -- I just feel really strongly that this is a great example of
a rule that needs to go away. And so, I would ask you, if there is
scientific data that is going to support continuing this rule in any
way beyond the ARC's recommendation, which I understand is going to
come in July -- and by the way, I would like you to make those -- that
process open. They're closed now for now reason. Their -- their
consideration should not be closed. They should be open.

If -- if we're not going to be able to have a new rule by
Christmas, I would really like something in writing to me on the
record as to what the problem would be around that.

**HUERTA**: Certainly.

As you said, the ARC will complete its rule during the Summer.
And the reason that we convene the -- the rulemaking committee was to
look at precisely the question you're talking about.

It is made up of all of the interests, not just those that are in
support, but also those that have operational concerns about how it
would actually be implement -- how many changes would be implemented.

And I'm very much looking forward to the findings, and we will
act on them.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

MCCASKILL: And -- and when you look into the G.A. question that
I asked, if you would also look into whether or not there's an
announcement made on the Air Force One that all devices must be turned
off...

**HUERTA**: Certainly.

MCCASKILL: Because if it's safe enough for the president of the
United States, it's safe enough for [****] flying public.

Thank you, Mr. Chairman.

ROCKEFELLER: Senator McCaskill, I don't care what the White
House said to you or you said to them. This has been a treasured five
minutes.

(LAUGHTER)

MCCASKILL: (OFF-MIKE) [****].

ROCKEFELLER: No, and I -- and you -- more than any human being
on the face of the earth, you want this rule changed. And...

(LAUGHTER)

And I think she may have a point. I don't know anything about
it, but I'd like to ask Chairman Hersman.

We're -- we're terrific at putting in rules and regulations and
just leaving them. Because they're sort of the safe thing to do when
we start out.

I have -- I've heard the same thing, that pilots are using
iphones or whatever. iPads in the -- the **aviation** cockpit.

I've heard people who argue exactly like she does. And I sort of
return to my, "Oh, no, this is what we do in **aviation**." And Senator
McCaskill is sort of moving me on this subject. And I think it's good
that she is, because it -- it drastically affects so many people.

Now, you could say, "Well, what if everybody was using them?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Would that make a difference?" I don't know the answer to that -- on the airplanes.

But I think it's a fair question -- excuse me, sir, because I interrupted your turn.

I think it's a fair question. I think she deserves an answer. And -- and, Chairman Hersman, I think to the extent that you have views on this, I'd like to know what they are. Because if it sounds like a safe rule -- I don't know need to know now, because I've interrupted Senator Coats.

But we do have a practice of making rules and regulations and sort of sticking by them. And the matter is that technology or the facts of human nature or whatever it is, it takes us to quite another place.

I think it's a fair question to raise. It would have tremendous significance to an awful lot of people. And if there's any danger in it, I don't think she would want to touch it -- Senator McCaskill -- any more than I would. But if it allows people to get a lot more work done and a lot more accomplished on their own trip, then I think it's -- [****].

Let me just ask you -- and again, I apologize to the good senator.

Is there a way to find out conclusively if it interferes with flight? The process of carrying out the flight? Does that exist?

Either one?

HERSMAN: Well, I can tell you that we have never identified in our accident investigations or incident investigations a situation where personal electronic devices in the cabin have affected the safety of flights, but I will tell you that we have identified situations where the cockpit crew are using their devices and being distracted.

In fact, we just had a -- a helicopter EMS accident where we had a texting helicopter pilot.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

So, we've identified it in the cockpit being a distraction, but
no safety issues that we've identified in the cabin.

ROCKEFELLER: But there's a huge difference there, because the
pilot's flying an airplane.

HERSMAN: Absolutely. Absolutely.

ROCKEFELLER: OK.

Well, I'd like to pursue it, but I -- I can't because Senator
Coats is a very dear friend of mine, and he has a chance to be heard.

COATS: Well, thank you, Mr. Chairman.

I -- this is an interesting topic. And I'd be willing to yield
some of my time if you want to consume more.

But I am -- I'm anxious to hear what the results of the study
are, because I have -- you know, we now have to carry two electronic
devices: one for official use and one for personal use. And several
times, I've found my -- one of them in my briefcase still turned on
when I'm on an airplane.

I -- I didn't break into tears, but I was a little concerned that
maybe I was interfering with somebody's communications.

And it's not comforting to hear that there's no incidences of
interference from the passengers, but whether it's us texting when we
drive or pilots texting while they're flying, it is a concern.
Now we got to worry not only about the person in front of us
shutting off their device and me shutting off my device, I have to
worry about the pilot shutting off his device.

So, hopefully, you can get us that answer sooner rather than
later.

I want to ask you a question, Administrator **Huerta**.

First of all, let me commend the FAA. The way you handle the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

process in reconsidering the exemption of cargo carriers for the pilot flight time duty and rest regulations.

I guess -- it is my understanding there was some errors that may have been made in developing the cost benefit justification. But FAA did do the right thing, and did its due diligence to make sure that it got it right. So I think we commend you for that -- taking that action.

But along those lines, as you know, the pilot training regulations passed into 2010 legislation, and its executive orders were issued by the president -- both president Clinton and President Obama clarifying that the agency specifically must adopt a regulation -- I'm quoting now -- "only upon a reasoned termination that its benefits justify the cost."

So my question is this. Has FAA conducted that study on increased pilot training and experience requirements? And if so, what -- what did -- what did you learn?

**HUERTA**: That is still an ongoing rulemaking. And part of the work that we do, as with every rule, is the development of cost benefit analysis. And that is work that we've had underway for a while.

It is our expectation, and I've committed, that we will complete that rule by October of this year, and make it available for everyone to see at that time.

COATS: OK, thank you.

Talk to me a little bit about the relationship of hiring pilots, between flight hours and proficiency.

Is there flexibility there, or is it just a hard line in terms of, "You're going to fly this kind of plane, you've got to have this many hours, no matter how proficient you might have been in the testing, in the procedures, in the knowledge, et cetera?

**HUERTA**: That is also the subject of an ongoing rulemaking. We were -- Congress called upon us to develop a new pilot qualification

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

rule by August of this year. And the provisions of law under which that rule is developed become self-executing on August 1st, that unless we promulgate a rule, then 1,500 hours becomes the required number of flight -- of hours of experience that a pilot has to have to pilot a commercial aircraft.

Now, the rule that we are -- we currently are looking at considers things that -- such as military experience, that can count against meeting of the hours requirement and that rule will be completed before August 1st.

COATS: And would you concede, though, that it's possible that two candidates -- one could have 1,500 hours and really not be proficient. Another could have 1,200 hours and be very proficient. How do you adjust for that kind of thing, particularly at a time when some people are saying we may have a shortage in hiring qualified pilots?

**HUERTA**: That is certainly a possibility, but becoming a pilot requires more than just experience. It's also that's where the training becomes important. That's where the rules that we've promulgated relating to flight duty and rest become important. How does -- how does an individual conduct themselves in all aspects of carrying out their job to ensure that they're proficient and are maintaining the highest levels of safety?

COATS: But the 1,500 is a bottom -- minimal requirement, regardless of how that person has performed in every other category.

**HUERTA**: As the law was passed by Congress, unless we complete our rulemaking and that rulemaking provides for things that can serve as credits against the 1,500 hours, then on August 1st 1,500 hours becomes self-executing.

COATS: I see. So that's possible that your rulemaking would allow some flexibility for that.

**HUERTA**: That is correct.

COATS: Thank you.

My time has expired, Mr. Chairman.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ROCKEFELLER: Thank you, Senator Coats.

Senator Thune has a question.

THUNE: Thank you, Mr. Chairman.

I want to wrap up here pretty quickly, but I want to drill down
on a couple of these budget questions. I also wanted to say -- this
is to the senator from Missouri's proposal that I would lend
bipartisan support to her request that we revisit this issue of
banning the use of hand-held devices on airplanes.

And in a minimum, I was telling you, Mr. Chairman, that in my
part of the country, we de-ice a lot. And when the door closes, even
if you're going to the de-icing pad, they tell you you have to shut
these things down. It just seems like these rules for rules sake
sometimes really go beyond what's even practical, let alone safe.

So let me -- let me, if I might, just ask the question, Mr.
Administrator. You had mentioned, I had mentioned earlier in a
question the transfer authority that you have allowing for 2 percent
transfers between activities. That does not require advance
permission. Correct?

**HUERTA**: That's correct.

THUNE: OK. So, in the rest of this year, fiscal 2013 and F.Y.
2014, would you utilize that 2 percent transfer authority to protect
airspace users from furloughs and tower closures?

**HUERTA**: That doesn't provide enough resource to protect them
from -- protect from furloughs and tower closures.

THUNE: In addition to that 2 percent transfer authority, would
you request permission to reprogram funding to protect airspace users
from tower closures and furloughs as soon as possible? That's also
something that you've can ask for.

**HUERTA**: We can ask of the Appropriations Committee for
reprogramming authority. That also would not get us completely there.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

THUNE: OK. You have in your budget, this is your -- within the operations account, $179 million for travel; $134 million for supplies; $541 million for consultants. And I guess my question is, since those things don't get you there, are these areas in which you would be willing to find some savings to offset the sequester cuts so the towers don't have to close?

**HUERTA**: We've reduced travel by 30 percent to all but operational travel, for example, a radar technician needing to travel to a site to repair a radar that might go out or travel associated with an **aviation** inspector needing to inspect a manufacturer of avionics or some other **aviation** equipment.

As it relates to the $500 million that you talk about in consultants' contracts, that is a budgetary category that takes account of everything which is a non-construction contract. The largest single contract in that category is the services contract that I previously mentioned, which is our -- FAA's telecommunications infrastructure -- the communication network that a private company provides between all the FAA facilities. That accounts for about half of it.

The next largest is a services contract for flight service stations. And again, those are services that are provided to pilots. The third-largest category are the contract towers that have generated so much concern. Of that amount, the amount that is actually what you would call traditional consultant services is around $20 million. And yes, we have gotten rid of the vast majority of that.

THUNE: Well, as you know, there's a bill up here that's got substantial bipartisan support -- I think 29 bipartisan cosponsors on that particular issue. And it seems to me at least when you look at the FAA budget and you break it down, and you look at the personnel account, which is about 70 percent, you still have about 30 percent of your budget that is in these other categories.
And I -- I certainly would hope that you would give careful scrutiny to scrub those areas of the budget to see what might be done to prevent something from happening that many people up here certainly are concerned about, as well as people across the country.

Thank you, Mr. Chairman.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1622440

ROCKEFELLER: Thank you.

Senator Cantwell?

CANTWELL: Thank you, Mr. Chairman.

And Administrator **Huerta**, could we add to this list, too, what is
the impact on NextGen implementation from sequestration? If you have
a general idea, you can tell me now. If you want to get back to us,
but what -- what will the impact on that be?

**HUERTA**: I'll provide you a general sense of what we're seeing
this year, and then for the record provide a more detailed response.

Within the current year, the principal impact we will see is
related to the need to bring operational personnel back to their home
facilities, to work on day-to-day operations. What that means is that
we're pulling individuals off of what we call "collaborative work
groups." These are work groups that we set up with FAA employees to
work with contractors and to work with our engineering and planning
staffs that are deploying NextGen, to actually work through the
details of how is this system going to handle live traffic.

And this is an extremely important aspect of what we do. In the
past, the agency hadn't done as much of that. That has gotten into
trouble on large programs. A few year ago, there was a program called
E-RAM (ph) which is the modernization of our en route platform. And
once we adopted these practices, we found that we had a much more
seamless transition to new technology.

And so the need to pull back resources and personnel from these
activities will delay the implementation of some of these new
technologies. We're viewing that...

CANTWELL: Aren't there some competitiveness issues with us
getting NextGen implemented?

**HUERTA**: Well, the thing -- where it affects us right now is in
our program where we're focusing on -- it's our program called the
optimization of airspace procedures. That's the deployment of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1622440

performance-based navigation that has the ability to reduce fuel burn, reduce costs, reduce emissions and noise impacts on local communities. And we have a number of these going around the country. You have probably one of the best known up there in Seattle, an initiative called Greener Skies.

It does slow down the deployment of those for two reasons. One is we don't have the people that can work through the operational details that we're able to deploy between now and the end of the fiscal year. The second aspect of that is development and maintaining procedures in and of itself is an expenditure -- for contractors, for design, for publication and training.

CANTWELL: I'd love to get more details in a written response so that we could share that with our colleagues about what the impact on that is.

I'd like to turn -- so what is -- what are the mechanisms the FAA is going to use to resolve the adverse conditions on the 787 issue? And how will you -- I mean, is that something the secretary does as an official, final decision? Or how do you decide about ETOP (ph) issues, all of that? Could you give us some idea?

**HUERTA:** Sure. What Boeing presented to us last month was a certification plan. And the certification plan had several components to it, but it essentially resulted in a redesign of the battery systems within the airplane; a containment system such that should -- to provide another layer of safety; and then also included -- and this was something that was negotiated with them, where we asked for thresholds to be met in terms of maintaining the highest levels of safety.

Once the certification plan was approved by us last month, then they embarked on a series of tests that we require -- about 20 distinct tests to prove that the system would operate as designed. Boeing has completed the testing and has provided a very extensive set of documents to the FAA. And those documents are currently under review right now. And that will be -- that will result in us making a final determination as to whether the aircraft can return to flight.

Coincident with that review was the -- was a review where we went back and looked at our original determination related to ETOP (ph)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

flight. And the question there is the airplane when it was grounded was certified for ETOPs (ph) of 180 minutes. And so the question for us was: Would we return at that level? And so that review is a concurrent review ongoing and when we make our final determination with respect to return to flight, we will also address that question.

CANTWELL: So, is this something the secretary decides or FAA decides or...

**HUERTA**: This is a determination and a recommendation that's made by all technical experts. It was my decision to ground the fleet. And I would be the one making the recommendation going forward.

CANTWELL: I see my time is expired, Mr. Chairman.

ROCKEFELLER: Actually, so has mine. The -- the -- I've got a cybersecurity thing that I have to be at. And what you can do, Senator Cantwell, is to close out this hearing and continue your line of questioning, because they can't move.

(LAUGHTER)

Would you like to do that?

(CROSSTALK)

ROCKEFELLER: I think you would.

(LAUGHTER)

CANTWELL: There are many issues, Mr. Chairman, that we could continue to go over, but I have asked my questions for today, but I know whether the ranking member wants to stay, and I'm happy to say if that's...

ROCKEFELLER: My schedule just changed, so you go right ahead.

CANTWELL: And continue to ask questions, Mr. Chairman, or...

ROCKEFELLER: Probably not. I mean, you don't want to get me started on general **aviation**, do you. So you go head.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

CANTWELL: Okay. Well, the only other question I had was for Mr. Dillingham about the process for -- with composites. We were very involved with composite manufacturing, and getting the FAA's Center of Excellence established, which was programmed to help collaboration between research institutions, the FAA and manufacturers identify issues, and I think you did a report on that certification process in which you think that that worked well.

Is that a model for what we should be doing?

DILLINGHAM: We looked in depth at the certification of the composite aspect of the Dreamliner 787, and in all cases we found the FAA did an excellent job. It could be a model for, you know, future situations such as [****]. Clearly composites are going to be an ever increasing part of **aviation** manufacturing, as it has been for decades now; it will continue to grow.

CANTWELL: And, Mr. Secretary, in all of the balancing of these issues, NextGen, the towers (ph), sequestration, battery issues, all of that, how do you prioritize these rulemaking that Mr. Guzzetti was talking about being so essential? Do you prioritize them in a ranking. Mr. Chairman, having oversight of the Coast Guard Committee for a while, and them being challenged with the implementation of the -- what was then called Deepwater Acquisition Program. We got to a point where so many members had so many interests in these various priorities. And I could go into this issue of the helicopter and medical issue.

But do you prioritize these rulemakings within the agency so that we can give members some idea of their prioritization?

**HUERTA:** We do. We go through a regular process of identifying what are deadlines for rulemakings? What are available resources? Every rulemaking requires a level of technical expertise associating with developing and ultimately promulgating and implementing a rule, how it relates to staff that are available, or contractors that are available to perform the needed cost-benefit analysis that Senator Coats asked about it.
And so it's marrying the technical expertise that we have with the timetables that have been developed and the complexity of the rule, and then the benefit that the rule will enable us to achieve as

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1622440

a result of that. And that's a regular process that we do go through.

CANTWELL: Well, it would be, I think, nice for the larger
**aviation** community to have a sense of the prioritization of those
rules. I mean, I'm sure some of it can be done simultaneously.

**HUERTA**: Sure.

CANTWELL: But in the context of people being able to to weigh in
on that prioritization. So we just have a little more definition
about what's coming next and when.

And I know that you commented today, which was great, on the
actual pilot rules that had to be implemented in their timeframe.

But since we just went through this entire list of things that
you're responsible for in a shrinking budget, I think part of our
challenge is to communicate exactly what that means from a timeframe
to our constituents. So I would appreciate that.

Mr. Chairman, thank you very much.

ROCKEFELLER: All right, I'm going to defer on general **aviation**.
Although I did in the briefing read their statistics as compared to
legacy **aviation**, and I was stunned by the difference with respect to
safety deaths (ph), the rest of it.

This was an important hearing. I don't think that we totally
connected the way I would have liked.

And, Mr. Administrator, I think we really do want to find out --
I'm pretty sure I speak for Senator Thune on this -- that what
sequestration actually does. And what we we got was a series of
things, as opposed to a prioritized laundry list of sacrifices, which
in the end -- I mean, in other words, I come out of this hearing with
a feeling we can do it. We can make it somehow, and I'm not sure if
I'm coming out with the right feeling, if sequestration sticks around.
And I don't say that to elicit a response; I simply say that to --
it's difficult on a subject like this to make it resonate, and
particularly when it effects so many people potentially, and is such a
large problem.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1622440

But anyway, we've worked at it. And grinding away is part of the deal in the U.S. Congress, and we have done that, and I thank all of you very much. And this hearing is adjourned.

END

    SEN. JOHN D. ROCKEFELLER IV
    Chairman
    Washington, D.C.

2013 WL 1622440

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

 **LexisNexis®**

1 of 13 DOCUMENTS

Copyright 1986 McGraw-Hill, Inc.

**AVIATION WEEK**
**& SPACE TECHNOLOGY**
Aviation Week & Space Technology

**July 28, 1986**

**SECTION:** AIR TRANSPORT; Pg. 32

**LENGTH:** 929 words

**HEADLINE:** ATA Cites Gramm-Rudman Cuts As Detrimental to Air Transport

**BYLINE:** By Cecilia Preble

**DATELINE:** Washington

**BODY:**

**Federal Aviation Administration** budget cuts forced by the **Gramm-Rudman**-Hollings deficit reduction law would shrink system capacity, delay **air traffic control** modernization and slow the growth of air transportaiton, according to the Air Transport Assn.

Among the consequences would be travel disruptions to more than 400 million air travelers, the ATA said.

Air transportation setbacks would be inevitable if the **FAA** is forced to cut 15%, or $ 700 million, from its Fiscal 1987 budget, ATA said. **Gramm-Rudman** already has forced the **FAA** to reduce its 1986 budget by $ 215 million, but that reduction was offset partially by an $ 84-million supplemental funding.

System capacity reductions may become necessary if full-performance-level (FPL) air traffic controller staffing does not accelerate, according to the ATA.

Traffic restrictions are being proposed by a number of government officials. In a statement before the Joint Economic Committee last week, Senator Robert C. Byrd (D.-W. Va.) suggested that FAA traffic restrictions have improved air safety in the past.

"This may be a reflection of the 1981 PATCO strike when the FAA reduced the volume of air traffic by imposing limits on the number of air traffic controllers manning the towers during the strike," Byrd said. "The result of such controls appears to have been a significant improvement in the margin of safety. That has some interesting implications for the present situation."

"The level of air traffic cannot be safely increased without a corresponding increase in FPL controllers," John F. Thornton, national coordiantor of the National Air Traffic Controllers Assn., said. "If the federal government wants to see a continued growth in commercial aviation, then it must pay to build up and upgrade its controller work force," Thornton said. "The Administration and the Congress must decide on the level of commercial aviation it can afford to control safely."

The General Accounting Office (GAO) reported that the FAA will need more than four years at its present rate of gain to satisfy its staffing requirements, and even longer to provide new equipment and other measures to reduce work load. Based on its own surveys, the GAO recommended that the FAA restrict air traffic at facilities where controllers are overworked until staffing goals are met.

USCA Case #13-1140    Document #1431741    Filed: 04/19/2013    Page 116 of 125

FAA has no such plan.    Traffic restrictions would be neither practical nor necessary, according to FAA Administrator Donald D. Engen, who added the GAO is qualified to collect data but not qualified to make operational decisions such as how to handle air traffic.    The limiting factor already in effect is the FAA's central flow control facility, which denies departure to aircraft the system cannot absorb safely, Engen said.

FAA contends it is qualifying full-performance-level controllers at a satisfactory rate and that the controller staffing problems are confined to a few en route centers.    According to FAA figures, the agency had 8,525 full-performance-level controllers on Jan. 1, 1986, and as of June 30 had raised that total to 9,107.    "We're very close to our controller force staffing goal of 14,480 by the end of September.    We had 14,262 at the end of June," the official said.

Delays in air traffic control modernization, such as the National Airspace System (NAS) Plan, are to be expected unless full authorization levels are restored.

Potential Slippages

"We grow increasingly concerned about potential slippages in the implementation of major components such as the advanced automation system, without which safety and productivity gains will be delayed," an ATA statement addressed to the Joint Economic Committee said.    "The financial and technical viability of the NAS Plan, under the present method of funding and management, is in serious jeopardy."

Engen concurred that Gramm-Rudman could delay the program by a few years, but another FAA official, Frank L. Frisbie, acting associate administrator for development and logistics, said that delays thus far in NAS Plan implementation have not been the result of a funding deficit, but rather expanded program requirements.

Contributing to the delays will be reductions in aviation research, engineering and development funding, which would be detrimental to NAS Plan implementation schedules and other FAA programs for increasing airspace and airport capacity, according to the ATA.

Air transportation growth will stagnate unless airport capacity enhancement continues.    The FAA's National Plan of Integrated Airport Systems (NPIAS) forecasts that $ 18.3 billion will be needed for airport development through 1993 and more than $ 12.5 billion of this will be needed to improve system capacity.

"The Airport Improvement Program is an integral part of those efforts, currently providing one out of every three dollars of airport capital financing.    Any funding deficiency would virtually destroy FAA's ability to make meaningful discretionary grants to airports where safety and capacity projects require more than can be funded solely by entitlement allocations," the ATA said.

Federal Corporation

To resolve the problems, the ATA proposes establishment of a federal corporation, to develop the air traffic control system and the airport improvement program (AW&ST, Apr. 13, p. 30).    Advantages of the corporation would include removal of the airport and airway programs from the annual federal budget battles and elimination of the constraints of FAA's personnel procurement and financial policy requirements.

URL: http://www.aviationnow.com



2 of 13 DOCUMENTS

Copyright 1986 McGraw-Hill, Inc.

**AVIATION WEEK**
**& SPACE TECHNOLOGY**
Aviation Week & Space Technology

**June** 30, 1986

**SECTION:** AIR TRANSPORT; Pg. 34

**LENGTH:** 1051 words

**HEADLINE:** Former FAA Official Foresees Potential Cuts in Foreign Programs

**BYLINE:** By Edward H. Kolcum

**DATELINE:** Atlanta

**BODY:**

The chief architect of U.S. aviation activities in Latin America said budget restrictions and subtle opposition by the Transportation Dept. could cause the effort to lose momentum and result in surrender of hardware and technical assistance programs to foreign competitors.

Jonathan Howe, who retired June 20 as director of the **Federal Aviation Administration** Southern Region, believes the **Gramm-Rudman**-Hollings Act mandating budget reductions, as well as other cost-cutting moves, will have the effect of reducing U.S. technical assistance initiatives by markedly cutting back on foreign travel by **FAA** experts. Until the budgetary moves, the **FAA** had relative freedom in assigning advisers in flight standards, airport facilities and other specialties to Latin America.

'Exclusive Policy'

In addition, Howe said the Transportation Dept. has opposed FAA foreign programs "in varying degrees ranging from those who think that international aviation activities are the exclusive policy of DOT." This was manifested in restrictions on the use of the FAA Beech King Air assigned to the region for trips to Latin America.

He said FAA Latin American initiatives have received strong support from Lynn Helms, previous FAA administrator, and Donald D. Engen, the current administrator. "Some of this has rubbed off at the top levels of DOT, but there is a view that FAA should not be meddling in foreign affairs. There are some senior people in DOT who are against the FAA international program.

"This is very short-sighted because what we have done is salvage the U.S. reputation and preeminence in aviation affairs. . . . Our professional diplomats recognize the spinoff value that aviation has on international diplomacy."

Prior to 1982, Howe said, the FAA basically had no program in Latin America except for receiving visitors and sending out literature. Even today only a few thousand dollars in appropriated FAA funds is spent in the region, which encompasses the Caribbean, Central America and South America. The program is effective, he said, because the agency is reimbursed for the time and travel used by the staff in technical assistance and other flight standards and safety programs.

Some FAA officials believe that Howe is overstating the problem. One position is that there is a long-standing philosophical conflict between Howe and some top Transportation Dept. officials, not a new interest by the department

in taking over FAA international areas that deal with flight.   Howe proponents agree with his contention that the Transportation Dept. is interfering with a successful program that has provided high visibility for the U.S. as the bene-factor in the region.

"We're always the good guys," Howe said in referring to U.S. offers to advise in all areas of flight safety.

Howe said that during the past four years the FAA Latin American effort has been highlighted in these locations:

* Grand Turk and Nassau, where the agency succeeded in filling a radar gap between Europe and South America.   Coverage now exists between Miami and San Juan that enables aircraft to use radar rather than oceanic separation standards.   Prior to installing the new radar, the only navigation aid in the sector was a 50-w. nondirectional beacon on Grand Turk.

* Granada.Following the U.S. invasion, high priority was given to completing the Point Salines Airport.   The FAA and Agency for International Development jointly directed this effort.   Construction of the airport had been started by the Cubans using Soviet equipment.   The completion job was made easier for FAA and AID because the Cuban techni-cians used FAA construction standards.   Howe said the FAA work there supported both U.S. foreign policy and the Caribbean Basin Initiative.   He said that despite the lack of diplomatic relations between the U.S. and Cuba, air traffic control centers in Miami and Havana work together closely.

* Latin American airports.   Security inspections have been made at 55 airports from which U.S. air carriers oper-ate.

* Flight standards in Colombia, Costa Rica, Grand Cayman and the Dominican Republic.   At the request of the foreign carriers, FAA experts provide advice on flight standards, including revisions to handbooks, stricter interpreta-tion of authority and diplomatic involvement leading to joint inspection of aircraft.   Other countries are interested in the program that could involve as many as 63 carriers.

* Safety seminars have been conducted in Colombia, Chile, Ecuador and Venezuela.   Additional seminars are planned in Argentina, Uruguay and Paraguay.

* Business seminars held in Miami for carriers in the region.

* COCESNA, a consortium of five Central American countries that jointly select air traffic control equipment, navigational and communications aids.

Airport Assistance

Additionally, FAA has advised Bolivia on runway pavements and procedures, Costa Rica on radar and controller training, Honduras on VORs and a possible new airport, Colombia on runway cleaning, Peru on a new airport at Cuzco, Ecuador on an accident investigation, six South American countries on emergency preparedness, Chile on radar testing and acceptance, Brazil on simulator training programs and Uruguay on the-on-the-job training programs.

Howe said that with these programs "visibility is the key.   It is important for these countries to perceive our inter-est at high levels to prove that we regard their safety as highly as they do."

He said there is potentially a big payoff to U.S. suppliers.   "The French subsidize their aerospace industry, and Helms made no bones about the fact that he wanted to capitalize on the U.S. reputation which, particularly by the French, and also by the British and Japanese.   Helms wanted to export the technology that had been forced out and priced out."

Howe said there is a perception that, "in times of tight money, undue emphasis is placed on international acivities.   My concern is that with my departure there will be less emphasis on these activities."

Howe, who will become president of the National Business Aircraft Assn., joined the FAA in 1963.   He is being replaced as Southern Region director by Garland P. Castleberry, who is being reassigned from the FAA Aeronautical Center in Oklahoma City.

URL: http://www.aviationnow.com

 **LexisNexis**®

3 of 13 DOCUMENTS

Copyright 1986 McGraw-Hill, Inc.

**AVIATION WEEK**
**& SPACE TECHNOLOGY**

Aviation Week & Space Technology

**March** 31, 1986

**SECTION:** AIR TRAFFIC CONTROL; Pg. 64

**LENGTH:** 1443 words

**HEADLINE:** National Airspace Plan Advances With Start of Host Computer Delivery

**BYLINE:** By Kenneth J. Stein

**DATELINE:** Washington

**BODY:**

First field deliveries of new IBM host computers to Federal Aviation Administration air route traffic control centers are under way, signaling a milestone toward implementation of the agency's 10-year National Airspace System plan, first published in 1981.

The **FAA** expects to maintain NAS program momentum, despite effects of **Gramm-Rudman**-Hollings legislation, through "creative financing," Frank L. Frisbie, acting associate administrator for development and logistics, said.

"Essentially, this means changing the way in which we budget, so that we ask for the portion of the project that we need in the year that we need it, instead of asking for all the funding in the year we make the request," Frisbie said.

"We liked the old way of doing business, but the downside was that carryovers were accumulated," he said.  "Now we don't have to ask for funding if we're not going to use it in the short term."

Initial delivery of the IBM 3083/Model BX1 host computer goes to Seattle Air Route Traffic Control Center, to be followed by deliveries to Houston, Denver and Boston centers.  Washington center, Leesburg, Va., and New York, at Islip, N.Y., are No. 5 and No. 14, respectively, on the delivery list, which is expected to conclude with Salt Lake City center in June, 1987.

Technical Center Delivery

A four-processor 3083 complex to provide central support and software development was delivered last September to the FAA's Technical Center, near Atlantic City, N.J.

IBM is producing the 3083/Model BX1 under a $432-million contract awarded in July, 1985, following an 18-month design competition with Sperry Corp. (AW&ST Aug. 5, 1985, p. 29).

The new host, which replaces IBM 9020 A and D models used in the centers for nearly 20 years, will be several times faster than a 9020D and provide storage for four times the data.  The new system will provide some immediate enhancements.  It will also support the second phase contractors, IBM Corp. and Hughes Aircraft, which are now in a dual runoff design competition for the controllers' sector suite in the Advanced Automation System, Frisbie said.

One of the two contenders will be selected to provide hardware and software that eventually will replace all consoles now in use at en route centers.

USCA Case #13-1140    Document #1431741    Filed: 04/19/2013    Page 120 of 125

Each company has provided sector suite mockups, which have been shown to the FAA and to traffic controllers, but a working sector suite has not yet been put together, according to Frisbie.   Work continues on software, intercom systems and other features, he said.

Evaluation of the initial prototypes will be performed at the contractors' facilities as part of the design competition phase.   Decisions remain to be made on the distribution of automation functions between the sector suites and the "back-room" hardware and the nature of the three displays in each sector suite.

Design Challenge

A key challenge is that design of the generic sector suite must provide adaptability to the particular function to be performed at each location, according to LeLand F. Page, director of systems engineering service.

One, two or three cathode ray tube displays might be employed at a given console to accomodate a multiplicity of operating modes, Page said.

All displays will be electronic, including flight data strips, which will be presented as electronic tabular displays rather than traditional paper strips.

Construction work is under way at the en route centers to provide new builidng wings that will accommodate the host computers, as well as initial sector suites.   Installation and initial checkout of the new hosts will be accomplished during late-night shifts and, with achievement of initial operational capability (IOC), controllers would begin to use the system on the midnight shift, according to FAA.

During the changeover, controllers will see few differences in information on their plan view displays (PVDs), with the exception of faster response times, officials said.   When the host computers are functional at all 20 domestic en route centers, new automated functions will be added, including upgraded conflict alert, conflict resolution advisories and expanded en route metering.   Progress in other elements of the upgraded air traffic system includes:

* Deliveries of new ASR-9 airport surveillance radars, being built by Westinghouse Electric Corp. under an initial $480-million contract, are expected to begin this summer.   A total of 137 ASR-9 systems is called for over the next five years, with 23 radars specifically scheduled for Defense Dept. installations.   The S-band system, designed for high reliability, incorporates system redundancy, built-in test and remote maintenance capabilities and problem isolation.

* Westinghouse is also engaged in a joint venture with Burroughs/System Development Corp. to product 137 Mode S beacon systems under a $228-million FAA contract.   The initial installations will provide Mode S coverage at altitudes above 12,000 ft.   First deliveries are scheduled for early in 1987.

* AT&T Technology Systems received a five-year requirements-type contract last spring for purchase of 312 units of radar microwave link equipment.   The initial order is valued at $49.2 million, with a ceiling amount of $139 million over the five-year period.

* Motorola, Inc., was awarded a $15.4-million contract last June for procurement of communications equipment and supplies for the National Radio Communications System program.

* System Development Corp. was awarded a $35.7-million contract for equipment to replace existing TPX-42 terminal automation systems.

* United Technologies Corp.'s Norden Systems was awarded a $27.3-million contract for air route surveillance radar modification kits.   Norden Systems also received a $55.6-million award last September for 30 new airport surface detection equipment (ASDE) radar systems.   The ASDE contract covers delivery of 17 units with options for 13 more.

* FAA recently commissioned the first group of automated flight service stations, designed to provide improved flight information and weather briefing services to general aviation pilots.   The first three stations are located at Cleveland and Dayton, Ohio, and at Bridgeport, Conn.   These stations are linked by dedicated communications lines to a central Flight Service Data Processing System (FSDPS), located at the Cleveland Air Route Traffic Control Center.   FAA plans to modernize and consolidate its present 300 FSS facilities around the country into 61 automated hub facilities.   E-Systems, the automated FSS contractor, has completed equipment deliveries to 19 FSSs, with associated FSDPS equipment at eight air route traffic control centers.   All deliveries are scheduled for completion by October, 1986.

USCA Case #13-1140    Document #1431741    Filed: 04/19/2013    Page 121 of 125

Page 7
National Airspace Plan Advances With Start of Host Computer Delivery   Aviation Week & Space Technology March 31, 1986

* Raytheon and Sperry have preproduction contracts for next-generation weather radars (NEXRAD) totaling $46 million, funded by the Commerce Dept., Defense Dept. and FAA.   FAA's share was $9.2 million.   "We're moving toward award of a single production contract this year," Frisbie said.   The agency is also moving toward implementation of a terminal-oriented NEXRAD to provide surveillance of approaches to major airports, he said.

* Hazeltine Corp., which has been moving toward production of microwave landing systems under a $90.6-million contract awarded in 1984, has encountered new delays, attributed to software and personnel problems, now expected to slow production by another eight or nine months, Frisbie said.   A Hazeltine prototype system has been operating at Richard E. Byrd International Airport, Richmond, Va., since last summer, providing service to a broad cross section of users (AW&ST Sept. 16, 1985, p. 81).   The prototype had earlier been used at two heliport locations in New York City.

Non-FAA microwave landing installations include equipment made by Bendix and Northrop Corp.'s Wilcox Electric subsidiary.

Alaskan Systems

Bendix has operating systems at Valdez, Alaska, and at Shemya in the Aleutian Islands.   Wilcox recently sold five MLS ground systems to United Technologies Corp., one for operations at Sikorsky Aircraft, Stratford, Conn., and two each for UTC company airports -- Rentschler, at East Hartford, Conn., and William P. Gwinn, at West Palm Beach, Fla.

An Aeronautical Radio (Arinc) Characteristic for airborne MLS equipment is expected to reach final form this year, Frisbie said.   FAA is also in final stages of selection on a contract for a voice switch and control system that will provide a "communications analog" to automation equipment, Frisbie said.   Two awards for competitive contracts are anticipated.

URL: http://www.aviationnow.com

**GRAPHIC:** Picture, One of the agency's newer towers looms high over St. Francisco International Airport.



4 of 13 DOCUMENTS

Copyright 1986 McGraw-Hill, Inc.

**AVIATION WEEK**
& SPACE TECHNOLOGY
Aviation Week & Space Technology

**March 24, 1986**

**SECTION:** AIR TRANSPORT; Airline Observer; Pg. 35

**LENGTH:** 86 words

**BODY:**

    **Federal Aviation Administration** officials "see no way of avoiding **furloughs** of our workforce" if Congress declines to give **FAA** a supplemental Fiscal 1986 appropriation for its operations accounts, **FAA** Deputy Administrator Richard H. Jones testified before the House Public Works and Transportation aviation subcommittee.   Jones called the proposal a "zero-dollar" supplemental, saying the Administration would request that the funds be taken out of appropriations for other parts of the Transportation Dept.

URL: http://www.aviationnow.com



5 of 13 DOCUMENTS

Copyright 1986 McGraw-Hill, Inc.

**AVIATION WEEK**
& SPACE TECHNOLOGY
Aviation Week & Space Technology

**January 27, 1986**

**SECTION:** WASHINGTON ROUNDUP; Pg. 17

**LENGTH:** 247 words

**HEADLINE:** FAA Dilemma

**BYLINE:** WASHINGTON STAFF

**BODY:**

Uncertainty persists on how deeply the **Gramm-Rudman**-Hollings deficit-reduction law will cut into the **Federal Aviation Administration** budget this year (AW&ST Jan. 13, p. 16). At a Senate Budget Committee hearing last week, Sen. Mark Andrews (R.-N.D.), chairman of the Appropriations transportation subcommittee, said he had been told by the White House that despite a purported $200-million **Gramm-Rudman** cut for **FAA,** the Administration was preparing a supplemental request to augment the agency's budget. "How do we know where we're supposed to go?" Andrews asked Office of Management and Budget director James C. Miller, 3rd. "There is a possibility that some 'emergencies' might be dealt with by means of a supplemental," Miller replied, "but I have not approved any supplemental for the FAA or anyone else at this point."

Battle over what form the Army's cancelled Sgt. York Divad replacement should take -- missile vs. guns vs. gun/missile hydrid -- continues within the Defense Dept. The Army itself has yet to make a final decision, is soliciting comments from industry and plans to issue a request for proposals for a line-of-sight system later this spring. Recently concluded Army study was expanded to include command/control/intelligence sensor requirements, the need for air defense in heavy/light division rear areas, a requirement to attack non-line-of-sight targets at ranges of 10 km. and the integration of existing weapons into the air defense role.

URL: http://www.aviationnow.com



6 of 13 DOCUMENTS

Copyright 1986 McGraw-Hill, Inc.
AVIATION WEEK
& SPACE TECHNOLOGY
Aviation Week & Space Technology

**January** 13, 1986

**SECTION:** DEFICIT REDUCTION ACT; Pg. 16

**LENGTH:** 654 words

**HEADLINE:** FAA Plans for Reduced Fiscal 1986 Budget

**DATELINE:** Washington

**BODY:**

**Federal Aviation Administration** has taken precautionary steps to live within its Fiscal 1986 budget, already cut by congressional mandate and slated for another a 3-5% slash resulting from the **Gramm-Rudman**-Hollings deficit reduction legislation.

Anticipating further cuts, the level of which remains uncertain, FAA Administrator Donald D. Engen put into effect a freeze on new hires, training, transfers, travel and new computer projects. Exempted from the freeze in each category are air traffic control, aviation safety inspection, security and work associated with the National Airspace System plan.

Engen said the steps would enable the agency to "stay within a reduced Fiscal 1986 availability and to position the agency for reduced outyear spending." He did not rule out the possibility of a reduction in force or furloughs at the agency once the 1986 budget appropriation level is known, possibly as late as Mar. 1. He described the budget constraints as severe.

Agency officials said the Administration currently was working on a 4.6% reduction in the Fiscal 1986 budget. Previously, cuts of both 3% and 5% were under discussion. Charles A. Whitfield, manager of the FAA's Budget Control Staff, said the agency was continuing its analysis of Gramm-Rudman effects and emphasized that no figures "are set in concrete."

Another official said a number of different scenarios were being examined.

FAA officials said a $135-million reduction in the 1986 budget was possible, and that operations is the mostly likely area to be cut. The operations budget covers personnel and salaries.

Congress agreed to a $55-million cut in the FAA Fiscal 1986 operations budget, reducing the total agency budget to $4.9 billion, in conference committee. The action was included in the continuing budget resolution passed last month.

The congressionally mandated cut dropped operations from $2.749 billion to $2.694 billion, facilities and equipment was cut from $1.1 billion to $993 million, research and development was cut from $198 million to $190 million and airport aid was dropped from $1 billion to $925 million.

Engen's freeze directive, in anticipation of further cuts, included:

* No outside hiring except for the exempted areas and commitments made by the Human Resources Management Div., formerly known as Personnel.

* Cancellation of 3,000 permanent change-of-station moves with an estimated cost of $60 million.

USCA Case #13-1140      Document #1431741      Filed: 04/19/2013      Page 125 of 125

* A prohibition on new information resource management projects (computer projects).

* Deferral of training except in exempted areas.

* Freeze on travel except in exempted areas.

* Equipment procurement restricted to vital NAS plan safety and security.

* No overtime except in exempted areas.

* Restrictions on procurement of supplies and materials.

* Deferral of maintenance projects unless required for preservation of life or property.

The cancellation of 3,000 change-of-station moves will result in the agency filling vacancies from within local hiring jurisdictions.

"One thing is certain, 1986 will not be as comfortable a budget year as people were expecting," Raymond Karam, acting assistance secretary of Transportation for budget and programs, said.

Karam said funding levels would be affected "in all aspects of aviation," and that the FAA and the Transportation Dept. were working to establish priority areas for funding.   Probable priority areas would include air traffic control, safety inspections, security and the NAS plan.   Some areas, Karam said, may be ignored.

He said the depth of budget reductions would be known after the Office of Management and Budget reports on Jan. 15.

Because of the escalating percentage of budget reductions called for in the Gramm-Rudman legislation, FAA officials anticipate deeper cuts in the agency's Fiscal 1987 budget, which will be proposed by the Administration next month.

URL: http://www.aviationnow.com